UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Christopher A. Moore<br>    Plaintiff<br><br>MARY LOU MOORE ESTATE<br>    Plaintiff<br><br>V.<br><br>10 TEMPLE PLACE LIMITED<br>PARTNERSHIP, VALUEOPTIONS<br>INC., RONALD I. DOZORETZ,<br>THOMAS E. ORAM, REBECCA<br>H. WHITE, NEW ENGLAND<br>MEDICAL CENTER HOSPITALS,<br>INC., LINDA SAHOVEY,<br>MARSHAL FOLSTEIN, ELLEN<br>ZANE, FALLON SERVICE INC.,<br>TIMOTHY J. FALLON; FEDERAL<br>MANAGEMENT CO. INC., BETTE<br>ANDERSON FISH, GILLIAN GATTE,<br>STEPHEN WILCHINS, MARY GAVIN<br>RICHARD HENKEN, ALLEN PERKINS<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION<br>)<br>)<br>)   NO: _____<br>)<br>)<br>)  05-10853 MLW<br>)  *Referred to MJ Leo T Sorokin*<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## INTRODUCTION

This is an action brought by the plaintiffs for
the substantial damages Mary Lou Moore suffered when Mrs.
Moore was assaulted and abducted from her home, when
false, misleading and deceptive medical and safety reports
were given to Mrs. Moore's doctors, when a false claim was
made that Mrs. Moore had attempted suicide, when one of
the defendants masqueraded as Mrs. Moore's social worker
and gave false medical information to psychiatrists who
were examining Mrs. Moore for possible mental illness.

COMPLAINT

PARTIES

RECEIVED

APR 2 2 2005

1.   Plaintiff, Christopher A. Moore (hereinafter
     "Plaintiff #1" or "Christopher Moore" or "Mr. Moore",
     is an adult who resides at 141 Intervale Street,
     Boston, Massachusetts 02121.

2.   Plaintiff, Estate of Mary Lou Moore (hereinafter
     "Plaintiff #2" or "Estate of Mary Lou Moore".) Mary
     Lou Moore died on April 20, 2004. Christopher A.
     Moore was appointed administrator of her Estate on
     June 28, 2004 by the Suffolk County Probate Court.
     Christopher A. Moore is an adult who resides at 141
     Intervale Street, Boston, Massachusetts 02121.

3.   Defendant, VALUEOPTIONS, INC. (hereinafter "Value
     Options") is a foreign corporation. The location of
     Value Options principal office is 240 Corporate
     Blvd., Norfolk, VA 23502.

4.   Defendant, Ronald I. Dozoretz is the President of
     Value Options. Ronald I. Dozoretz business address is
     240 Corporate Blvd., Norfolk, VA 23502.

5.   Defendant, Thomas E. Oram is the Treasurer of Value
     Options. Thomas E. Oram's business address is 240
     Corporate Blvd., Norfolk, VA 23502.

2

6.  Defendant, Rebecca H. White is the Secretary of Value
    Options. Rebecca H. White's business address is 240
    Corporate Blvd., Norfolk, VA 23502.

7.  Defendant, 10 Temple Place Limited Partnership
    (hereinafter "10 Temple Place LP") is a domestic
    limited partnership. 10 Temple Place LP is the owner
    of the Stearns Building located at 10 Temple Place,
    Boston Massachusetts 02121. The location of the
    principal office of 10 Temple Place LP is 175 Federal
    St. #700, Boston, Massachusetts 02110.

8.  Defendant, New England Medical Center Hospitals,
    Inc.. (hereinafter "New England Medical") is a
    domestic corporation. New England Medical has it's
    principal office at 750 Washington Street, Boston, MA
    02111.

9.  Defendant, Ellen Zane is the President of New England
    Medical. Ellen Zane's principal business address is
    750 Washington Street, Boston, MA 02111.

10. Defendant, Linda Sahovey is a psychiatric nurse at
    New England Medical and the Director of the Boston
    Emergency Services Team. Linda Sahovey's principal
    business address is 750 Washington Street, Boston, MA
    02111.

2005 APR 22 P 4: 54

11.    Defendant, Marshal Folstein is the Chief of
       Psychiatry at New England Medical and the Director of
       the Boston Emergency Services Team. Marshal
       Folstein's principal business address is 750
       Washington Street, Boston, MA 02111.

12.    Defendant, FALLON SERVICE, INC. (hereinafter
       "Fallon") is a domestic profit corporation. The
       location of the principal office is 95 Eliot Street,
       Milton, Massachusetts 02186.

13.    Defendant, Timothy J. Fallon is the President of
       Fallon Service, Inc.. Timothy J. Fallon's address is
       93 Cary Avenue, Milton, Massachusetts 02186.

14.    Defendant, Federal Management Co., Inc. (hereinafter
       "Federal Management") is a domestic profit
       corporation created pursuant to Mass Gen. Laws c.
       156d and manages the rental property at 10 Temple
       Place, Boston, MA 02111, known as the Stearns
       (hereinafter "Stearns"). Federal Management has a
       principal place of business at 175 Federal Street,
       Suite 700, Boston, Massachusetts 02110.

15.    Defendant Mary Gavin is an adult resident of
       Massachusetts and is employed by the Defendant
       Federal Management as the Residential Coordinator for
       the Stearns. The Residential Coordinator's office is

4

located at the Stearns, 10 Temple Place, Boston, Massachusetts 02111.

16. Defendant, Allen Perkins is an adult resident of Massachusetts and is employed by the Defendant Federal Management as property manager for the Stearns. The property management office is located at the Stearns, 10 Temple Place, Boston, Massachusetts 02111.

17. Defendant, Bette Anderson Fish is an adult resident of Massachusetts and is employed by the Defendant Federal Management as President of the Corporation of Federal Management. The Corporate office is located at 175 Federal Street, Suite 700, Boston, Massachusetts 02110.

18. Defendant, Gillian Gattie is an adult resident of Massachusetts and is Treasurer and Secretary of the Corporation of Federal Management. The Corporate office is located at 175 Federal Street, Suite 700, Boston, Massachusetts 02110.

19. Defendant, Richard Henken is an adult resident of Massachusetts and is a Director of the Corporation of Federal Management. The Corporate office is located at 175 Federal Street, Suite 700, Boston, Massachusetts 02110.

5

20.  Defendant, Stephen Wilchins is an adult resident of
     Massachusetts and is a Director of the Corporation of
     Federal Management. The Corporate office is located
     at 175 Federal Street, Suite 700, Boston,
     Massachusetts 02110.

## JURISDICTION

21.  The court has jurisdiction over this matter pursuant
     to 28 U.S.C. (s) 1331. Civil Rights Act of 1866 42
     U.S.C. (s) 1982; Civil Rights Act of 1866 42 U.S.C
     (s) 1981; Title VI of the Civil Rights Act of 1964 42
     U.S.C (s) 200d et seq.; Title VI (s) 601; Section 504
     of the Rehabilitation Act of 1973; 29 U.S.C. (s) 794.

## FACTS

22.  The Stearns Building, located at 10 Temple Place was
     converted to elderly housing in 1981. The Stearns is
     Section 8 project-based HUD-subsidized housing. After
     the conversion there was one owner for the Stearns
     from 1981 until December 2001 when the title was
     transferred to 10 Temple Place LP.  The Federal
     Management Company became the managers for the
     Stearns.

23.  Mary Lou Moore was one of the original tenants at the
     Stearns when she moved in at age sixty-five. Mrs.
     Moore lived at The Stearns continuously up through
     the ownership transfer in December of 2001.

24. Within two weeks after taking control of the
    property, Residential Services Coordinator Mary Gavin
    sent a letter to Mrs. Moore's son, Christopher Moore
    stating that Mrs. Moore had been "wandering the hall
    with her hat and coat on." When apprised of the
    letter, Mrs. Moore told Mr. Moore that she always put
    her hat and coat on when she went outside, especially
    in the winter time. Mrs. Moore stated she had no idea
    why Ms. Gavin would write such a letter. Mrs. Moore
    told her son that she was suspicious of what was
    going on.

25. Shortly after receiving Ms. Gavin's letter Mr. Moore
    met with Ms. Gavin's supervisor, Stearns property
    manager, Allen Perkins. During the meeting Mr.
    Perkins stated that Mrs. Moore could not safely
    continue to live at the Stearns building. Mr. Moore
    disagreed and told Mr. Perkins that Mrs. Moore had
    lived safely at the Stearns for more than twenty
    years. Mrs. Perkins stated that he was a trained
    Psychologist/Psychiatrist and therefore an "expert"

26. Shortly after that first meeting between Mr. Perkins
    and Mr. Moore, Mr. Perkins sent another letter
    requesting a second meeting with Mr. Moore in order
    to share Mr. Perkins concerns about Mrs. Moore's
    "situation" and to gather input as to how these

7

"situations" would be dealt with. During the second meeting Mr. Perkins continued to state the same vague concerns he had with Mrs. Moore's "situation." Mr. Moore left the second meeting quite concerned that Mr. Perkins seemed obsessed with his mother, convinced that Mr. Perkins felt that she had no place in the Stearns facility that was now under his control.

27. After the second meeting with Allen Perkins, Mr. Moore spoke again with Mary Gavin who spoke again about "safety issues" surrounding Mrs. Moore's tenancy. Mr. Moore demanded that Ms. Gavin detail the specific safety issues that related to Mrs. Moore. Ms. Gavin stated that Mrs. Moore was constantly wandering in and out of the building and in and out of traffic all day long. Mr. Moore told Ms. Gavin that those accusations were completely untrue and demanded that Ms. Gavin produce times, dates and witnesses and other facts to support her accusations. Ms. provided no factual support for the accusations, nor did she offer any eyewitness accounts. Ms. Gavin only statement was that it was "common knowledge."

28. Several weeks after that conversation with Ms. Gavin, Mr. Moore was entering the lobby of the Stearns apartment building when he was approached by David

8

Cross, the Stearns maintenance manager. Mr. Cross
wanted to inform Mr. Moore that earlier that same day
another maintenance worker, Jose (Miguel) Guittierez
had found Mrs. Moore wandering in front of the
Filenes building at Downtown Crossing, a quater of a
mile from her home. Mr. Cross told Mr. Moore that
when he found Mrs. Moore she had no idea where she
was, nor did she know how to find her way back home.
According to Mr. Cross, Mr. Guittierez, who just
happened to be in the same vicinity, escorted Mrs.
Moore back to the safety of her apartment.

29.    When Mr. Moore heard this story from Mr. Cross, Mr.
Moore asked Mr. Cross to  immediately call Mr.
Guittierez so that Mr. Moore could get a first hand
account about what had actually happened with his
mother. Mr. Guittierez met Mr. Moore and Mr. Cross in
the lobby of the Stearns. Mr. Cross asked Mr.
Guittierez to describe for me how Mr. Guittierez had
found Mrs. Moore wandering and lost in front of
Filenes at Downtown Crossing, and then escorted her
back to her apartment at the Stearns. Mr. Guittierez
immediately interrupted Mr. Cross. Mr. Guittierez
told Mr. Cross that his version of events was wrong.
Mr. Guittierez stated that he had never found Mrs.
Moore wandering and lost at Downtown Crossing. Mr.

Guittierez stated earlier that day Mrs. Moore had
mistakenly gotten off the Stearns elevator on the
wrong floor (the ninth floor) instead of on the
correct floor (the tenth floor, where her apartment
was located.) Mr. Guittierez stated that all he had
done was direct Mrs. Moore to the tenth floor. Mr.
Guittierez had never found Mrs. Moore wandering and
lost a quater mile from her home.

30. Mr. Cross then apologized to Mr. Moore, telling him
that that he must have misunderstood what Mr.
Guittierez had told him.

31. Mr. Moore proceeded to his mother's apartment and
told her about the encounter he had just had with Mr.
Cross and Mr. Guittierez and the story that he had
been told. Mrs. Moore told her son she did not
understand why Federal Management employees were
fabricating safety issues about her. Mr. Moore told
his mother that because he had challenged Federal
Management's claim that his mother was wandering and
lost, and because Federal Management had been forced
to admit that their allegation that Mrs. Moore was
wandering and lost was completely false, Mr. Moore
believed that  Federal Management would most likely
cease their campaign of intimidation and fabrication
that was being waged against his mother.

10

FACTS: FEDERAL MANAGEMENT ENGINEERED THE ASSAULT AND
ABDUCTION OF MARY LOU MOORE

32.    On Monday, April 22, 2002 Mrs. Moore left her
       apartment and proceeded to the lobby to visit other
       elderly friends and to pick up her mail. The mail
       boxes for all residents is located in the first floor
       lobby of the Stearns. When Mrs. Moore reached the
       lobby she was met by two employees of the Fallon
       Ambulance Company. These two employees approached
       Mrs. Moore and told her that she was to come with
       them. Mrs. Moore had never seen these strangers and
       had no idea what they wanted with her. Mrs. Moore
       politely refused. The Fallon Ambulance Company
       Employees tell Mrs. Moore that they want her to get
       on the ambulance stretcher. Mrs. Moore again refused.
       Federal Management employees also tried to convince
       Mrs. Moore to get on the stretcher and Mrs. Moore
       refused. Fallon Ambulance Company employees then rush
       at Mrs. Moore, taking her by her hands and feet and
       forcing her onto the stretcher. Once on the stretcher
       Mrs. Moore was strapped securely. Mrs. Moore
       continues to struggle for her freedom but to no avail
       as she is forced out of her home into the waiting

11

ambulance and taken to the emergency psychiatric ward
at Boston Medical Center.

33.    Mrs. Moore later described to her son Christopher
       Moore her ordeal that day which she described as
       terrifying. According to Mrs. Moore she had come into
       the lobby and was approached by strangers who
       insisted that she come with them. Mrs. Moore stated
       that since she was in the safety of her own home and
       since other people were also in the lobby area she
       did not immediately feel threatened. Mrs. Moore told
       her son that she had no idea who these people were or
       what they wanted. Mrs. Moore stated that she calmly
       told these strangers that she would not go with them.
       Mrs. Moore stated that a few minutes later the two
       strangers attacked her. Mrs. Moore stated that the
       strangers rushed her and caught her off guard. She
       stated that she struggled with the strangers while
       calling out for help to her landlord, the Federal
       Management employees who were present during the
       melee. Mrs. Moore stated that Federal Management
       employees assisted the Fallon Ambulance Company
       employees.

34.    Joining Mrs. Moore at the emergency psychiatric
       clinic was Federal Management employee Mary Gavin who
       misrepresented herself as being Mrs. Moore's social

                                12

worker to the doctors, nurses and the psychiatric team evaluating Mrs. Moore, according to Christopher Moore.

35. Shortly after Mrs. Moore's admission to the emergency psychiatric clinic at Boston Medical Center, the psychiatrist examining Mrs. Moore telephoned her emergency contact, Christopher Moore, who was in Boulder Colorado, and informed him that his mother had been brought involuntarily to the hospital for a psychiatric examination.

36. Mr. Moore has stated that this call from the psychiatrist was how he first was made aware that his mother had been brought to the hospital. Mr. Moore stated that he never received a call from the, Federal Management Company before, during or after his mother was brought to the hospital.

37. According to Mr. Moore when the psychiatrist examining his mother advised him of the circumstances and issues surrounding his mother's case, the psychiatrist told him that according to the hospital reports, the information was accurate and factual. The psychiatrist told Mr. Moore that his mother had been found wandering the streets in traffic, that an initial report had been made that his mother was suicidal, and that his mother had fought with the

13

Fallon Ambulance EMT's who brought her to the hospital. Mr. Moore stated that the person whom the doctor was describing had no resemblance to his mother. But Mr. Moore had to accept that these facts were true because the psychiatrist stated that these facts were accurate.

38. The doctor told Mr. Moore that his mother's social worker had told the medical team that his mother had been neglected by her son Christopher, that she had been decompensating for more than two years, and was unable to care for herself. It was then that Mr. Moore realized that Federal Management was accusing him of neglect and abuse of his mother and blaming him for his mother's current situation.

39. The psychiatrist told Mr. Moore that it was his mother's social worker who had found his mother wandering the streets in traffic and had escorted his mother to the hospital. The doctor added that Mrs. Moore's social worker was still present in the examining area. Mr. Moore asked the doctor to put the social worker on the phone. The doctor did. It was only then, after the social worker came to the phone that Mr. Moore learned that the person whom the doctors and nurses thought was Mrs. Moore's social

14

worker was in fact not a social worker at all, but
Mary Gavin, an employee for Federal Management.

40.   Mr. Moore contacted the Board of Social Workers at
the Registration Division of the Commonwealth of
Massachusetts and according to the records on file
Mary Gavin is not registered as a social worker in
the Commonwealth of Massachusetts.

41.   Mr. Moore recognized Ms. Gavin's voice when she
answered the telephone. Mr. Moore demanded to know
why Ms. Gavin mislead the psychiatrists and other
medical personnel by telling them that she was the
social worker for Mrs. Moore. Mary Gavin did not say
a word. Nothing. There was total silence from her end
of the phone. Mr. Moore then demanded to know why
Federal Management did not contact him the minute
that they said they found Mrs. Moore wandering in the
streets. Ms. Gavin told Mr. Moore that she had called
Mr. Moore but was unable to reach him. Mr. Moore
asked how could Ms. Gavin not been able to reach him
when the psychiatrist had just called Mr. Moore and
had no difficulty reaching him. Mary Gavin did not
say a word. Nothing. Once again there was total
silence from her end of the phone. Mr. Moore reminded
Ms. Gavin that she also had the telephone number for
his sister, Naomi. Ms. Gavin agreed that she had the

number. Mr. Moore asked if Ms. Gavin had called his sister when she supposedly couldn't reach him. Mary Gavin informed Mr. Moore that she had not called his sister Naomi. Mr. Moore asked why she had not called Naomi and Ms. Gavin responded that, "I assumed that Naomi was not home at the time."

42.   Mr. Moore then asked Ms. Gavin to give the phone back to the psychiatrist. Mr. Moore asked the psychiatrist how she and the other medical personnel had come to believe that Mary Gavin was Mrs. Moore's social worker.   The psychiatrist told Mr. Moore that Ms. Gavin had introduced herself as Mrs. Moore's social worker. Mr. Moore then informed the psychiatrist that Mary Gavin was not, nor had she ever been, Mrs. Moore's social worker. According to Mr. Moore the psychiatrist was surprised to learn this. Mr. Moore then instructed the psychiatrist that no member of the medical team examining Mrs. Moore was to provide any additional information to Mary Gavin. Mr. Moore instructed the psychiatrist that Mary Gavin should not be allowed any further contact with Mrs. Moore. Mr. Moore instructed the psychiatrist to terminate any and all further access to Mrs. Moore's medical information. The psychiatrist agreed to do this immediately.

16

43.  While Mr. Moore was still on the telephone, the
     psychiatrist informed Ms. Gavin of Mr. Moore's
     instructions. The psychiatrist told Mr. Moore that
     Ms. Gavin immediately left the hospital.

44.  Mr. Moore stated to the psychiatrist that something
     appeared to be very wrong with the allegation about
     Mrs. Moore wandering the streets, suicidal. Mr. Moore
     stated that Mrs. Moore had never attempted suicide
     and had never exhibited, or been diagnosed as having
     any mental illness in her life. The psychiatrist
     asked Mr. Moore if he knew the name of Mrs. Moore's
     primary care physician. Mr. Moore said he did and
     informed the psychiatrist that his name was Dr. Eric
     Hardt. Dr. Hardt was the clinical director of the
     Boston Medical Center Geriatric Unit. The Geriatric
     Unit was also located at the same hospital as the
     emergency psychiatric unit where Mrs. Moore was being
     examined. The psychiatrist said that Dr. Hardt was a
     colleague of hers and that she would immediately
     contact him and ask him to come to the emergency room
     to consult with them. The psychiatrist told Mr. Moore
     that she would contact Mr. Moore as soon as the
     psychiatric examination was concluded.

45.  Mr. Moore called his sister Naomi after concluding
     his conversation with the psychiatrist. Naomi left

17

her home and went straight to the emergency
psychiatric department.

46. The psychiatrists finished their examination of Mrs.
Moore. The psychiatrist called Mr. Moore with the
results of their examination. The psychiatric team
had determined that Mrs. Moore had not attempted
suicide. The psychiatric team also determined that
Mrs. Moore had no mental illness. The psychiatrist
determined that Mrs. Moore had a medical disability,
dementia due to her age (eighty six years old.) The
psychiatrists discharged Mrs. Moore to go home with
the only instruction to follow up with her regular
scheduled appointment with Dr. Hardt.

47. Mrs. Moore has had dementia for several years, a fact
that Federal Management and their employees were well
aware.

48. Medical records at New England Medical Center clearly
spell out that Mrs. Moore had dementia.

49. Mr. Moore began an immediate investigation of what
happened with his mother Mrs. Moore upon his return
from Colorado. After talking with his mother and with
Mrs. Moore's neighbors who witnessed the incident,
Mr. Moore was able to determine that Mrs. Moore had
never been outside of the apartment building on the

day she was alleged to have been walking in traffic
all day attempting suicide.

50.  Mr. Moore demanded a meeting with the Board of
Directors of the Federal Management Company and the
meeting was held on June 13, 2002. Attending the
meeting were Mr. Moore. Representing Federal
Management were Mary Gavin, Allen Perkins, Bette
Anderson and Donna Bronk. The meeting was held at in
the community room at the Stearns building.

51.  During the meeting Mary Gavin, Allen Perkins, Bette
Anderson and Donna Bronk admitted to Mr. Moore that
Mrs. Moore was never wandering the streets in traffic
and suicidal even though that is exactly what Federal
Management employee Mary Gavin stated as being fact
in her call to New England Medical Center. Mary
Gavin, Allen Perkins, Bette Anderson and Donna Bronk
admitted to Mr. Moore that none of them ever saw Mrs.
Moore outside of the Stearns building at any time on
the day that she was forcibly taken to the emergency
psychiatric clinic.

52.  Allen Perkins admitted to Mr. Moore that from the
very first day that 10 Temple Place LP took ownership
and Federal Management became the landlord of the
Stearns (December 21, 2001) up through the date of
the meeting with Mr. Moore (June 13, 2002) he, Allen

19

Perkins had never seen Mary Lou Moore outside of the Stearns apartment building. Not once. Only inside the apartment building.

53. Based on the admissions that Mary Gavin and Allen Perkins, Bette Anderson and Donna Bronk made during the meeting, that Mrs. Moore was never outside of the building on April 22, 2002 when Mary Gavin initiated the call falsely stating that Mrs. Moore was attempting to commit suicide by walking in traffic all day, it was clearly established that the entire events on April 22, 2002 was a complete fabrication, a deliberate attack against Mary Lou Moore initiated by the 10 Temple Place LP and the Federal Management Company against an eighty six year old elderly African American widow.

54. Mary Gavin and Allen Perkins were fully aware that the Fallon Ambulance EMTs were fighting and subduing an innocent woman who had no idea why she was being attacked.

55. According to the report made by the employees of the Fallon Ambulance Service, staff of Federal Management were in attendance and provided assistance to the Fallon Ambulance Service EMT's, im trying to get Mary Lou Moore to get on the stretcher. When she refused, Mrs. Moore was physically subdued, taken by her

extremities, lifted up and forcibly placed on the stretcher where she was immobilized and restrained.

56.   Mary Gavin knew that she was providing falsified medical and safety information to the psychiatric team conducting the psychiatric examination and knew that the doctors and nurses were operating under the assumption that Mrs. Moore had attempted to commit suicide when in fact Federal Management had fabricated the entire suicide story.

57.   Mr. Moore believes that Federal Management had to know what Mrs. Moore's reaction would be when she was set upon by the Fallon Ambulance Service EMTs, that Mrs. Moore, fearing for her safety and under assault and possible abduction, would fight for her life.

58.   According to "Triage Report" filed by New England Medical Center, Mary Gavin and the Fallon EMTs described Mrs. Moore as being verbally and physically assaultive. "Per Ms. Gavin and EMTs pt became verbally and physically assaultive when ambulance arrived and stated that her children would beat up anyone who touched her." Federal Management staff and the Fallon EMTs misrepresented the facts about Mrs. Moore's attempt to protect herself, because of her extraordinary trauma and fear that she was being assaulted and abducted. Federal Management and the

21

Fallon EMTs chose to categorize Mrs. Moore's struggle for her freedom as an indication of a person out of control, verbally and physically assaultive. This description served to bolster the fraudulent story of a woman who was mentally ill and suicidal and clearly influenced the psychiatric staff examining Mrs. Moore who thought they were dealing with a mentally ill and suicidal person.

59. At the close of the meeting Christopher Moore had with the Board of Directors and staff of Federal Management, Bette Anderson, President of the Board of Federal Management Company pulled Christopher Moore aside and told Mr. Moore that the people who were really responsible for having his mother, Mary Lou Moore, forced out of her home and taken to the emergency psychiatric clinic was the Massachusetts Department of Elder Affairs and agents from their "Elders at Risk" Protective Services Unit.

60. Mr. Moore took Ms. Anderson's statement to mean that agents from the Department of Elder Affairs were the ones who were directing Federal Management employees on what actions to take in order to get the New England Medical Center and the Boston Emergency Services Team to issue a "Section 12", what actions to take to get an involuntary commitment order from

22

New England Medical Center and the Boston Emergency Services Team. That these agents from the Department of Elder Affairs were directing Federal Management employees on what they should say to psychiatrists examining Mrs. Moore in order to convince them that Mrs. Moore was suicidal, that Federal Management should send one of their employees, Mary Gavin, to the emergency psychiatric clinic and pretend to be Mrs. Moore's social worker to establish her credentials and thereby the legitimacy of her allegations, and that these actions would force the psychiatrists to issue a medical certificate for involuntary placement by reason of mental illness which would allow Federal Management to evict Mrs. Moore from her home.

61. The day after the meeting between Mr. Moore and Federal Management Directors and employees (June 14, 2002) Mr. Moore received a letter from Federal Management Board President Bette Anderson. In the letter Ms. Anderson put in writing the statement that she had made during the previous day's meeting, that the "Elders at Risk" unit from the Massachusetts Department of Elder Affairs was responsible for the criminal actions that were committed against Mrs. Moore on April 22, 2002 when she was taken by force

23

out of her home on the fabricated charge that she had
tried to commit suicide.

FACTS - THE BEST TEAM AND NEW ENGLAND MEDICAL CENTER

62. The Boston Emergency Services Team (BEST) provides
emergency psychiatric services for individuals who
are judged to be mentally ill.

63. Value Options oversees and hires the members of The
BEST Team. Tufts-New England Medical Center has the
state contract for the BEST Team.

64. Mary Lou Moore had been a patient for many years at
various clinics operated out of Tufts-New England
Medical Center. Tufts-New England Medical Center is
located a few blocks from the Stearns Building where
Mrs. Moore lived.

65. Mrs. Moore had an extensive medical history on file
at New England Medical Center because of her many
clinic and hospital visits over the years.

66. According to the Triage Report filed by the BEST Team
New England Medical Center had it listed that Mary
Lou Moore was not suicidal, had never been suicidal,
had no history of violence, had no history of taking
drugs. With all the medical records stating that Mrs.
Moore had no history of mental illness, and on the
basis of one telephone call from Federal Management,

24

the BEST Team and New England Medical issued a
"Section 12" dangerous persons medical warrant to
have Mrs. Moore forcibly taken to an emergency
psychiatric clinic for an involuntary examination.

67. According to the Triage Report filed by BEST TEAM
employee Bill Almy, on April 22, 2002 at 1:21 PM Mary
Gavin, identified as a "Case Manager", telephoned to
state that Mary Lou Moore is an 86 year old female
who is demented, disorganized, unable to care for
herself, thinks she's in Alabama and continues to
walk in traffic all day long

WHEREFORE, the plaintiffs demand judgment against the
defendants for compensatory and punitive damages plus
interest, costs and attorney's fees, and such other relief
as this court deems necessary, proper and just.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Respectfully Submitted

Christopher A. Moore

Respectfully Submitted

Estate of Mary Lou Moore
Christopher A. Moore, Administrator

25

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

MOORE, CHRISTOPHER. A.

## DEFENDANTS

10 TEMPLE PLACE L P

APPENDIX B    CIVIL COVER SHEET

(b) County of Residence of First Listed Plaintiff    SUFFOLK
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed    SUFFOLK
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED

(c) Attorney's (Firm Name, Address, and Telephone Number)

RECEIVED

05-10853 MLW

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☑ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                         and One Box for Defendant)

|  | PLF | DEF |  | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of | Slander | ☐ 640 R.R. & Truck | PROPERTY RIGHTS | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | LABOR | SOCIAL SECURITY | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | Injury | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 730 Labor/Mgmt.Reporting | |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | & Disclosure Act | FEDERAL TAX SUITS | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | or Defendant) | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | Security Act | 26 USC 7609 | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☑ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
another district
(specify)

☐ 6  Multidistrict
Litigation

☐ 7  Appeal to
District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

CIVIL RIGHTS ACT OF 1866 - 42 U.S.C. (S) 1982

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☑ Yes    ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions):    45 11 C) 27.11.1V.C002

JUDGE _____    DOCKET NUMBER _____

DATE  4/21/2005

SIGNATURE OF ATTORNEY OF RECORD    moore - PRO SE

FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

APPENDIX C   LOCAL COVER SHEET

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) *CHRISTOPHER A MOORE*
   *V   10 TEMPLE PLACE   LIMITED PARTNERSHIP*

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL
   COVER SHEET.   (SEE LOCAL RULE 40.1(A)(1)).       *05 - 108*

       __    I.        160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

       X     II.       195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
                       740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases*

       __    III.      110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                       315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                       380, 385, 450, 891.

       __    IV.       220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                       690, 810, 861-865, 870, 871, 875, 900.

       __    V.        150, 152, 153.

       RECEIVED
       APR 22 2005

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)).  IF MORE THAN ONE PRIOR RELATED CASE
   HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
   COURT?
                                                        YES  ☐      NO  ☒

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
   PUBLIC INTEREST?   (SEE 28 USC §2403)
                                                        YES  ☐      NO  ☒
   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                        YES  ☐      NO  ☐

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
   28 USC §2284?
                                                        YES  ☐      NO  ☒

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
   COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
   SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
                                                        YES  ☐      NO  ☒

       A.    IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

             EASTERN DIVISION  ☐       CENTRAL DIVISION  ☐        WESTERN DIVISION  ☐

       B.    IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
             GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

             EASTERN DIVISION  ☒       CENTRAL DIVISION  ☐        WESTERN DIVISION  ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME   *CHRISTOPHER A. MOORE (PRO SE)*
ADDRESS   *141 INTERVALE ST   BOSTON MA   02121*
TELEPHONE NO.   *617 442 5999*

(AppendixC.wpd - 11/27/00)