**USMS**
**SCREENED**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Christopher A. Moore         )
    Plaintiff            )
                  )
MARY LOU MOORE ESTATE        )
    Plaintiff            )
                  )   AMENDED COMPLAINT
V.                           )   NO:05-10853-MLW
                  )
10 TEMPLE PLACE LIMITED      )
PARTNERSHIP, VALUEOPTIONS)
INC., RONALD I. DOZORETZ,)
THOMAS E. ORAM, REBECCA      )
H. WHITE, MICHAEL A.         )
TAYLOR, NEW ENGLAND          )
MEDICAL CENTER HOSPITALS,)
INC., LINDA SAHOVEY,         )
MARSHAL FOLSTEIN, ELLEN      )
ZANE, CHARLES STREET RHF )
HOUSING, INC., LAVERNE R.)
JOSEPH, STEPHEN J.           )
MARGETIC, LINDA LISTOE,      )
JOHN E. TRNKA, DONALD W. )
KING, FALLON SERVICE,        )
INC., TIMOTHY J. FALLON, )
FEDERAL MANAGEMENT CO.       )
INC.; BETTE ANDERSON         )
FISH, GILLIAN GATTE, MARY)
GAVIN, DAVID CROSS, ALLEN)
PERKINS, RICHARD HENKEN, )
STEPHEN WILCHINS             )
    Defendants           )

## INTRODUCTION

      This is an action brought by the plaintiffs for

the substantial damages Mary Lou Moore suffered when Mrs.

Moore was assaulted and abducted from her home, when

false, misleading and deceptive medical and safety reports

were given to Mrs. Moore's doctors, when a false claim was

1

made that Mrs. Moore had attempted suicide, when one of the defendants masqueraded as Mrs. Moore's social worker and gave false medical information to psychiatrists who were examining Mrs. Moore for possible mental illness. Christopher Moore also seeks damages for the physical and emotional harm and distress caused upon him because of the physical, emotional psychological distress and abuse suffered by Mary Lou Moore.

1.    Plaintiff, Estate of Mary Lou Moore (hereinafter "Estate" or "Estate of Mary Lou Moore".) Mary Lou Moore died on April 20, 2004. Christopher A. Moore was appointed administrator of her Estate on June 28, 2004 by the Suffolk County Probate Court. Christopher A. Moore is an adult who resides at 141 Intervale Street, Boston, Massachusetts 02121.

2.    Plaintiff, Christopher A. Moore (hereinafter "Christopher Moore" or "Mr. Moore", is an adult who resides at 141 Intervale Street, Boston, Massachusetts 02121.

3.    Defendant, 10 Temple Place Limited Partnership (hereinafter "10 Temple Place LP") is a domestic limited partnership. 10 Temple Place LP is an owner of the Stearns Building located at 10 Temple Place, Boston Massachusetts 02121. The location of the

2

principal office of 10 Temple Place LP is 175 Federal St. #700, Boston, Massachusetts 02110.

4.   Defendant, VALUEOPTIONS, INC. (hereinafter "Value Options") is a foreign corporation. The location of Value Options principal office is 240 Corporate Blvd., Norfolk, VA 23502.

5.   Defendant, Ronald I. Dozoretz is an adult and is the President of Defendant Value Options. Ronald I. Dozoretz business address is 240 Corporate Blvd., Norfolk, VA 23502.

6.   Defendant, Thomas E. Oram is an adult a Director of Defendant Value Options. Thomas E. Oram's business address is 240 Corporate Blvd., Norfolk, VA 23502.

7.   Defendant, Rebecca H. White is an adult and is the Secretary of Defendant Value Options. Rebecca H. White's business address is 240 Corporate Blvd., Norfolk, VA 23502.

8.   Defendant, Michael A. Taylor is an adult and is the Treasurer of Defendant Value Options. Michael A. Taylor's business address is 240 Corporate Blvd., Norfolk, VA 23502.

9.   Defendant, New England Medical Center Hospitals, Inc. (hereinafter "New England Medical" or "NEMC") is a domestic corporation. New England Medical has it's

3

principal office at 750 Washington Street, Boston, Massachusetts 02111.

10. Defendant, Linda Sahovey is an adult and is a psychiatric nurse employed by Defendant New England Medical. Linda Sahovey is also the Director of the Boston Emergency Services Team. New England Medical's principal business address is 750 Washington Street, Boston, MA 02111.

11. Defendant, Marshal Folstein is an adult and the Chief of Psychiatry at New England Medical. Marshal Folstein is also the Director of the Boston Emergency Services Team. New England Medical's principal business address is 750 Washington Street, Boston, Massachusetts 02111.

12. Defendant, Ellen Zane is an adult and is President of Defendant New England Medical. New England Medical's principal business address is 750 Washington Street, Boston, Massachusetts 02111.

13. Defendant, Charles Street RHF Housing Inc. (hereinafter "Charles Street"), is a domestic corporation. Charles Street RHF Housing, Inc. is the General Partner for Defendant 10 Temple Place Limited Partnership. Charles Street RHF Housing Inc. has it's principal office at National Registered Agents, 11 Beacon Street, Ste 1300, Boston, Massachusetts 02108.

4

14.  Defendant, Laverne R. Joseph is an adult and is the
     President of Defendant Charles Street RHF Housing,
     Inc. Laverne R. Joseph's address is 6471 Surrey Dr.,
     Long Beach, California 90815

15.  Defendant, Stephen Margetic is an adult and is the
     Treasurer of Defendant Charles Street RHF Housing,
     Inc. Stephen J. Margetic's address is 26062 Spur
     Branch Ln, Laguna, Hills, California

16.  Defendant, Linda Listoe is an adult and is the Clerk
     of Defendant Charles Street RHF Housing, Inc. Linda
     Listoe's address is 8439 Beach Circle, Cypress,
     Massachusetts 90630

17.  Defendant, John Trnka is an adult and is a Director
     of Defendant Charles Street RHF Housing, Inc. John
     Trnka's Address is 6244 Lyndhurst Dr., Newburgh, IN
     47630

18.  Defendant, Donald W. King is an adult and is a
     Director of Defendant Charles Street RHF Housing,
     Inc. Donald W. King's address is 2610 Bowdion Ct,
     Sacramento, California 95826.

19.  Defendant, FALLON SERVICE, INC. (hereinafter
     "Fallon") is a domestic profit corporation. Fallon's
     principal office is 95 Eliot Street, Milton,
     Massachusetts 02186.

20.  Defendant, Timothy J. Fallon is an adult and is
     President of Defendant Fallon. Timothy J. Fallon's
     address is 93 Cary Avenue, Milton, Massachusetts
     02186.

21.  Defendant, Federal Management Co., Inc. (hereinafter
     "Federal Management") is a domestic profit
     corporation. Federal Management manages the rental
     property at 10 Temple Place, Boston, MA 02111, known
     as the Stearns (hereinafter "Stearns"). Federal
     Management has a principal place of business at 175
     Federal Street, Suite 700, Boston, Massachusetts
     02110.

22.  Defendant, Bette Anderson Fish is an adult and is
     employed by the Defendant Federal Management as
     President. Federal Management's Corporate office is
     located at 175 Federal Street, Suite 700, Boston,
     Massachusetts 02110.

23.  Defendant, Gillian Gattie is an adult resident of
     Massachusetts and is Treasurer and Secretary of the
     Corporation of Federal Management. The Corporate
     office is located at 175 Federal Street, Suite 700,
     Boston, Massachusetts 02110.

24.  Defendant, Mary Gavin is an adult and is employed by
     Defendant Federal Management as the Residential
     Coordinator for the Stearns. The Residential

6

Coordinator's office is located at the Stearns, 10
Temple Place, Boston, Massachusetts 02111.

25. Defendant, David Cross is an adult and is employed by
Defendant Federal Management as the Maintenance
Supervisor for the Stearns. The Maintenance
Supervisor's office is located at the Stearns, 10
Temple Place, Boston, Massachusetts 02111.

26. Defendant, Allen Perkins is an adult and is employed
by the Defendant Federal Management as property
manager for the Stearns. The property management
office is located at the Stearns, 10 Temple Place,
Boston, Massachusetts 02111.

27. Defendant, Richard Henken is an adult resident of
Massachusetts and is a Director of the Corporation of
Federal Management. The Corporate office is located
at 175 Federal Street, Suite 700, Boston,
Massachusetts 02110.

28. Defendant, Stephen Wilchins is an adult resident of
Massachusetts and is a Director of the Corporation of
Federal Management. The Corporate office is located
at 175 Federal Street, Suite 700, Boston,
Massachusetts 02110.

## JURISDICTION

29. The court has jurisdiction over this matter pursuant
to 28 U.S.C. (s) 1331. Civil Rights Act of 1866 42

U.S.C. (s) 1982; Civil Rights Act of 1866 42 U.S.C

(s) 1981; Title VI of the Civil Rights Act of 1964 42

U.S.C (s) 200d et seq.; Title VI (s) 601; Section 504

of the Rehabilitation Act of 1973; 29 U.S.C. (s) 794.

## FACTS

30.   The Stearns Building, located at 10 Temple Place was
      converted to elderly housing in 1981. After the
      conversion there was one owner for the Stearns from
      1981 until December 2001 when the title was
      transferred.   The Federal Management Company became
      the new apartment building managers.

31.   Mary Lou Moore was one of the original tenants at The
      Stearns when she moved in at age sixty-five. Mrs.
      Moore lived at The Stearns continuously up through
      the ownership transfer in December of 2001.

32.   Within two weeks after taking control of the
      property, Residential Services Coordinator Mary Gavin
      sent a letter to Mrs. Moore's son, Christopher Moore
      stating that Mrs. Moore had been "wandering the hall
      with her hat and coat on." When apprised of the
      letter, Mrs. Moore told her son Christopher that she
      always put her hat and coat on when she went outside,
      especially in the winter and stated she had no idea
      what would be the purpose of Ms. Gavin writing such a
      letter. Mrs. Moore told her son Christopher that she
      was suspicious of what was going on.

33.   After receiving the letter from Ms. Gavin, Mr. Moore
      met with her supervisor Allen Perkins. During the
      meeting Mr. Perkins stated that Mrs. Moore could not
      safely continue to live at the Stearns building. Mr.
      Moore disagreed and told Mr. Perkins that Mrs. Moore

8

had lived safely at the Stearns for more than twenty years. Mr. Perkins stated that he was a trained Psychologist/Psychiatrist and therefore an "expert"

34. Shortly thereafter Mr. Moore received a second letter from Mr. Perkins requesting a second meeting with Mr. Moore in order to share Mr. Perkins concerns about Mrs. Moore's "situation" and to gather input as to how these "situations" would be dealt with. During the second meeting Mr. Perkins continued to state the same vague concerns he had with Mrs. Moore's "situation." Mr. Moore left the second meeting quite concerned that Mr. Perkins seemed obsessed with his mother, convinced that Mr. Perkins felt that she had no place in the Stearns facility that was now under his control.

35. After the second meeting with Allen Perkins, Mr. Moore spoke again with Mary Gavin who spoke about "safety issues" surrounding Mrs. Moore's tenancy. Mr. Moore demanded that Ms. Gavin detail the specific safety issues that related to Mrs. Moore. Ms. Gavin stated that Mrs. Moore was constantly wandering in and out of the building and in and out of traffic all day long. Mr. Moore told Ms. Gavin that those accusations were completely untrue and demanded that Ms. Gavin produce times, dates and witnesses and other facts to support her accusations. Ms. Gavin provided no factual support for the accusations, nor did Ms. Gavin offer any eyewitness accounts. Ms. Gavin only statement was that it was "common knowledge."

36. Several weeks after that conversation with Ms. Gavin, Mr. Moore was entering the lobby of the Stearns apartment building when he was approached by David

9

Cross, the Stearns maintenance manager. Mr. Cross
informed Mr. Moore that earlier that same day another
maintenance worker, Jose (Miguel) Guittierez had
found Mrs. Moore wandering and lost in front of the
Filenes building at Downtown Crossing, a quarter of a
mile from her home. Mr. Cross told Mr. Moore that
Mrs. Moore had no idea where she was, nor did she
know how to find her way back home. According to Mr.
Cross, Mr. Guittierez, who just happened to be in the
same vicinity, escorted Mrs. Moore back to the safety
of her apartment.

37. When Mr. Moore heard this story from Mr. Cross, Mr.
Moore asked Mr. Cross to immediately call Mr.
Guittierez so that Mr. Moore could get a first hand
account about what had actually happened with his
mother. Mr. Guittierez met Mr. Moore and Mr. Cross in
the lobby of the Stearns. Mr. Cross asked Mr.
Guittierez to describe how he had found Mrs. Moore
wandering and lost in front of Filenes and then
escorted her back to her apartment. Mr. Guittierez
immediately interrupted Mr. Cross and stated that Mr.
Cross' version of events was wrong. Mr. Guittierez
stated that he had never found Mrs. Moore wandering
and lost at Filenes in Downtown Crossing. Mr.
Guittierez stated that he had met Mrs. Moore earlier
that day when she had mistakenly gotten off the
Stearns elevator on the wrong floor, the ninth floor,
instead of on the correct floor, the tenth floor,
where her apartment was located. Mr. Guittierez
stated that all he had done was direct Mrs. Moore to
the tenth floor. Mr. Guittierez had never found Mrs.
Moore wandering and lost a quarter mile from her
home.

10

38. Mr. Cross then apologized to Mr. Moore, telling him that that he must have misunderstood what Mr. Guittierez had told him.

39. Mr. Moore proceeded to his mother's apartment and told her about the encounter he had just had with Mr. Cross and Mr. Guittierez and the story that he had been told. Mrs. Moore told her son she did not understand why Federal Management employees were fabricating safety issues about her. Mr. Moore told his mother that because he had challenged Federal Management's claim that his mother was wandering and lost, and because Federal Management had been forced to admit that their allegation that Mrs. Moore was wandering and lost was completely false, Mr. Moore believed that Federal Management would now cease their campaign of intimidation and fabrication that was being waged against his mother.

FACTS: FEDERAL MANAGEMENT ENGINEERED THE ASSAULT AND ABDUCTION OF MARY LOU MOORE

40. On Monday, April 22, 2002 Mrs. Moore left her apartment and proceeded to the lobby to visit other elderly friends and to pick up her mail. The mail boxes for all residents is located in the first floor lobby of the Stearns. While Mrs. Moore was in the lobby she was met by two employees of Fallon. These two Fallon employees were EMTs and told Mrs. Moore that she had to come with them. Mrs. Moore had never seen these strangers and had no idea what they wanted with her. Mrs. Moore politely refused. The Fallon EMTs told Mrs. Moore that they want her to get on an ambulance stretcher. Mrs. Moore again refused.

11

Federal Management employees also tried to convince
Mrs. Moore to get on the stretcher but Mrs. Moore
refused. The Fallon EMTs then rush at Mrs. Moore,
taking her by her hands and feet and forcing her onto
the stretcher. Once on the stretcher Mrs. Moore was
strapped securely. During the course of this assault
Mrs. Moore struggled vigorously for her freedom but
to no avail. Securely strapped she is forced out of
her home into the waiting ambulance and taken to the
emergency psychiatric ward at Boston Medical Center.

41. Mrs. Moore later described to her son Christopher
Moore her ordeal that day which she described as
terrifying. According to Mrs. Moore she had come into
the lobby and was approached by strangers who
insisted that she come with them. Mrs. Moore stated
that since she was in the safety of her own home and
since other people were also in the lobby area she
did not immediately feel threatened. Mrs. Moore
stated that she had no idea who these people were or
what they wanted. Mrs. Moore stated that she calmly
told these strangers that she would not go with them.
Mrs. Moore stated that a few minutes later the two
strangers attacked her. Mrs. Moore stated that the
strangers rushed her and caught her off guard. She
stated that she struggled with the strangers while
calling out for help to her landlord, the Federal
Management employees who were present during the
assault. Mrs. Moore stated that Federal Management
employees assisted the Fallon Ambulance Company
employees.

42. Joining Mrs. Moore when she was brought to the
emergency psychiatric clinic was Federal Management
employee Mary Gavin. Ms. Gavin misrepresented herself

12

as being Mrs. Moore's social worker to the doctors,
nurses and the psychiatric team evaluating Mrs. Moore
(**See Exhibit A1** for a copy of Emergency Department
Nursing Documentation that stated that Mrs. Moore was
accompanied by social worker.)

43. Shortly after Mrs. Moore's admission to the emergency
psychiatric clinic at Boston Medical Center, the
psychiatrist telephoned Mrs. Moore's son Christopher
Moore who was listed in the hospital record's as Mrs.
Moore's emergency contact. Mr. Moore was in Colorado.
The psychiatrist informed Mr. Moore that his mother
had been brought involuntarily to the hospital for a
psychiatric examination because she had been found
wandering in traffic all day.

44. Mr. Moore stated that the call from the psychiatrist
was when he was first made aware that his mother had
been brought to the hospital. Mr. Moore stated that
he never received a call from anyone at Federal
Management either before, during or after his mother
was brought to the hospital.

45. According to Mr. Moore when the psychiatrist
examining his mother told him what had happened to
his mother, the psychiatrist stated that the
information she was providing to him was factual. The
psychiatrist told Mr. Moore that his mother had been
found wandering the streets in traffic, that an
initial report had been made that his mother was
suicidal; that his mother had fought with the Fallon
EMT's who brought her in to the hospital. Mr. Moore
stated that the person whom the psychiatrist was
describing had no resemblance to his mother. But Mr.
Moore felt he had to accept that these facts were
true because the BMC psychiatrist stated that the

13

facts and circumstances that brought Mrs. Moore to
the hospital were accurate.

46. Mr. Moore continued asking questions of the
psychiatrist for any additional information that she
could provide. It was at this point that the
psychiatrist told Mr. Moore that his mother's social
worker was providing the medical team with past
incidents of his mother's erratic behavior and past
issues of safety. The psychiatrist told Mr. Moore
that his mother's social worker had escorted his
mother to the hospital. The doctor added that the
social worker was still present in the examining
area. Mr. Moore asked the psychiatrist to put the
social worker on the phone. The psychiatrist did. It
was only then, after the social worker came to the
phone that Mr. Moore learned that the person whom the
psychiatrists and nurses thought was Mrs. Moore's
social worker was in fact not a social worker at all,
but Mary Gavin, an employee for Federal Management.

47. Later, Mr. Moore contacted the Board of Social
Workers at the Registration Division of the
Commonwealth of Massachusetts and according to the
records on file Mary Gavin was not registered as a
social worker in the Commonwealth of Massachusetts.

48. Mr. Moore recognized Ms. Gavin's voice when she
answered the telephone. Mr. Moore demanded to know
why Ms. Gavin had mislead the psychiatrists and other
medical personnel by telling them that she his
mother's social worker. Mary Gavin did not say a
word. Nothing. There was total silence from her end
of the phone. Mr. Moore then demanded to know why
Federal Management did not contact him the minute
that they said they found Mrs. Moore wandering in the

14

streets. Ms. Gavin told Mr. Moore that she had called
Mr. Moore but was unable to reach him. Mr. Moore
asked Ms. Gavin why she couldn't reach him when the
psychiatrist had just called Mr. Moore and had no
difficulty reaching him. Mary Gavin did not say a
word. Nothing. Once again there was total silence
from her end of the phone. Mr. Moore reminded Ms.
Gavin that she also had the telephone number for his
sister, Naomi. Ms. Gavin agreed that she had Naomi's
telephone number. Mr. Moore asked if Ms. Gavin had
called his Naomi when she supposedly couldn't reach
him. Mary Gavin stated that she had not called Naomi.
Mr. Moore asked why she had not called Naomi and Ms.
Gavin responded that, "I assumed that Naomi was not
home at the time."

49.   Mr. Moore then asked Ms. Gavin to give the phone back
to the psychiatrist. Mr. Moore asked the psychiatrist
how she and the other medical personnel had come to
believe that Mary Gavin was Mrs. Moore's social
worker. The psychiatrist told Mr. Moore that Ms.
Gavin had introduced herself as Mrs. Moore's social
worker. (**See Exhibit A1**.) Mr. Moore then informed the
psychiatrist that Mary Gavin was not, nor had she
ever been his mother's social worker. According to
Mr. Moore the psychiatrist was surprised to learn
this. Mr. Moore then instructed the psychiatrist that
no member of the medical team examining Mrs. Moore
was to provide any additional information to Mary
Gavin. Mr. Moore instructed the psychiatrist that
Mary Gavin should not be allowed any further contact
with his mother. Mr. Moore instructed the
psychiatrist to terminate any and all further access

15

by Mary Gavin to his mother's medical information. The psychiatrist agreed to do this immediately.

50. While Mr. Moore was still on the telephone, the psychiatrist informed Ms. Gavin of his instructions. According to the psychiatrist Ms. Gavin immediately left the hospital.

51. Mr. Moore stated to the psychiatrist that something appeared to be very wrong with the allegation about his mother wandering the streets and suicidal. Mr. Moore stated that Mrs. Moore had never attempted suicide and had never exhibited or been diagnosed as having any mental illness. The psychiatrist asked Mr. Moore if he knew the name of Mrs. Moore's primary care physician. Mr. Moore said he did and informed the psychiatrist that it was Dr. Eric Hardt, the clinical director of the Boston Medical Center Geriatric Unit. The psychiatrist stated that Dr. Hardt was a colleague of hers and that she would immediately contact him and ask him to come to the emergency room to consult with them. The psychiatrist told Mr. Moore that she would contact him as soon as the psychiatric examination was concluded.

52. Mr. Moore called his sister Naomi after concluding his conversation with the psychiatrist. Naomi left her home and went straight to the emergency psychiatric department.

53. The psychiatrists finished their examination of Mrs. Moore. The psychiatric team determined that Mrs. Moore had not attempted suicide. The psychiatric team determined that Mrs. Moore had no mental illness. The psychiatrists discharged Mrs. Moore to go home with the only instruction that she should follow up with her regular scheduled appointment with Dr. Hardt.

16

54. Mr. Moore began an immediate investigation of what happened with his mother upon his return from Colorado. After talking with his mother and with two of Mrs. Moore's neighbors who witnessed the incident, Mr. Moore immediately determined that Mrs. Moore had never been outside of the apartment building on the day she was alleged to have been walking in traffic all day attempting suicide.

55. After gathering supporting documents from New England Medical and from Fallon Ambulance Company on May 21, 2002 Mr. Moore sent the Board of Directors of Federal Management a letter in which he demanded a meeting with members of the Board.

56. On June 4, 2002 Bette Anderson (Fish) responded by sending a letter to Mr. Moore agreeing to meet at a mutually convenient time.

57. The meeting was held on June 13, 2002. Attending the meeting were Mr. Moore and representing Federal Management were Mary Gavin, Allen Perkins, Bette Anderson Fish and Donna Bronk. The meeting was held in the community room at the Stearns building.

58. During the meeting Mary Gavin, Allen Perkins, Bette Anderson and Donna Bronk admitted that Mrs. Moore was never wandering the streets in traffic and suicidal even though that is exactly what Federal Management employee Mary Gavin stated as fact in her call to New England Medical Center and to the psychiatrists and nurses at Boston Medical Center. Mary Gavin, Allen Perkins, Bette Anderson and Donna Bronk admitted that none of them had seen Mrs. Moore outside of the

17

building at any time during the day when Federal
Management stated that she was wandering the streets
in traffic, suicidal.

59. Allen Perkins admitted that from the very first day
that Federal Management became the landlord of the
Stearns (December 21, 2001) up through the date of
the meeting (June 13, 2002) he, Allen Perkins had
never even seen Mary Lou Moore outside of the Stearns
apartment building. Not once.

60. Based on the admissions that Mary Gavin and Allen
Perkins, Bette Anderson and Donna Bronk made during
the meeting, admissions that included the fact that
my mother was never outside of the building on April
22, 2002 when Mary Gavin initiated the call falsely
stating that she was attempting to commit suicide by
walking in traffic all day, it was clearly
established that the allegations surrounding the
events on April 22, 2002 were a complete fabrication,
a deliberate attack against Mary Lou Moore initiated
by Federal Management and it's employees against an
eighty six year old elderly African American widow.

61. Mary Gavin and Allen Perkins were fully aware that
the Fallon EMTs were fighting and subduing an
innocent woman who had no idea why she was being
attacked when they watched the events unfold in the
lobby of the Stearns on April 22, 2002 and did
nothing to help Mrs. Moore from her attackers.

62. According to the report made by the employees of
Fallon, staff of Federal Management were in
attendance and provided assistance to the Fallon
EMT's in trying to get Mary Lou Moore to get on the
stretcher (**See Exhibit B1** for a copy of Fallon Report
stating "staff members also try to convince pt to get

18

on stretcher.") When she refused, Mrs. Moore was
physically subdued, taken by her extremities, lifted
up and forcibly placed on the stretcher where she was
immobilized and restrained.

63. Mary Gavin knew that she was providing falsified
medical and safety information to the psychiatric
team conducting the psychiatric examination and knew
that the doctors and nurses were operating under the
assumption that Mrs. Moore was a person who had
attempted to commit suicide when in fact Federal
Management had fabricated the entire suicide story.

64. Federal Management had to know what the reaction of
Mrs. Moore would be to being set upon by the Fallon
EMTs; that Mrs. Moore, fearing for her safety and
under assault and possible abduction would fight for
her life. According to Fallon EMT report Mrs. Moore
is described as being "extremely angry and started
hitting EMTs". According to report given by EMTs and
Ms. Gavin to Medical personnel at Boston Medical
Center, Mrs. Moore was verbally and physically
assaultive. "Per Ms. Gavin and EMTs pt became
verbally and physically assaultive when ambulance
arrived and stated that her children would beat up
anyone who touched her." Federal Management staff
knew that Mrs. Moore was fighting for her life
because of extraordinary trauma and fear that she was
being assaulted and abducted. Federal Management
chose to categorize Mrs. Moore's struggle for her
freedom as an indication of a person out of control,
verbally and physically assaultive, in order to
bolster Federal Management's fraudulent story of a
woman who was mentally ill and suicidal.

19

65. At the close of the June 13, 2003 meeting between
Christopher Moore, and the Board of Directors and
staff of Federal Management, Bette Anderson Fish,
President of the Board of Federal Management pulled
Christopher Moore aside and told Mr. Moore that the
people who were really responsible for having his
mother, Mary Lou Moore, forced out of her home and
taken to the emergency psychiatric clinic were agents
from the Elders at Risk, Protective Services Unit out
of the Massachusetts Department of Elder Affairs
office. Mr. Moore took Ms. Anderson's statement to
mean that agents from the Department of Elder Affairs
were the ones who were directing Federal Management
employees on what actions to take in order to get the
New England Medical and the Boston Emergency Services
Team to issue a "Section 12", the involuntary
commitment order. That these agents from the
Department of Elder Affairs were also directing
Federal Management on what they should say to
psychiatrists examining Mrs. Moore in order to
convince them that Mrs. Moore was suicidal thereby
forcing the psychiatrists to issue a medical
certificate for her involuntary placement, the result
of which would lead to her eviction from her home.

66. On June 14, 2002, the day after the meeting between
Mr. Moore and Federal Management Directors and
employees, Mr. Moore received a letter from Federal
Management Board President Bette Anderson Fish. In
the letter Ms. Anderson repeated the statement that
she had made during the previous day's meeting, that
the "Elders at Risk" unit from the Massachusetts
Department of Elder Affairs was responsible for
having Mrs. Moore taken out of her home involuntarily

20

the previous day on April 22, 2002 when she was taken
by force out of her home on the fabricated charge
that she had tried to commit suicide. (See **exhibit C1**
for a copy of Bette Anderson (Fish) June 14, 2002
letter to Mr. Moore.)

67.  On July 3, 2002 Mr. Moore sent a seventeen page
report to Bette Anderson (Fish) and Federal
Management. The report proved that Federal
Management's supposed concern for Mrs. Moore safety
were completely unfounded and that Federal Management
was directly responsible for the assault and
abduction of Mrs. Moore on April 22, 2002. (**See
exhibit D1-D17** for a copy of the report from Mr.
Moore to Federal.

68.  On February 10, 2003 Mr. Moore sent an eighty-eight
page report to the Board of Directors and/or Partners
of the Retirement Housing Foundation, the Charles
Street RHF Housing, and 10 Temple Place LP demanding
an investigation into the actions of their agents,
Federal Management, and the actions of Federal
Management employees against their tenant, Mary Lou
Moore. Stuart Hartman, Vice President of Operations
responded on behalf of the owners of the Stearns. In
a letter dated February 13, 2003 Mr. Hartman stated
that "an immediate investigation into the
allegations" of abuse against Mary Lou Moore would be
started. (**See Exhibit E1** for a copy of Mr. Hartman's
letter.)

69.  On April 7, 2003 Mr. Hartman sent a second letter to
Mr. Moore informing him that "We thoroughly reviewed
the documentation you previously submitted" and "are
attempting to conclude our investigation." Mr.
Hartman requested that Mr. Moore furnish his

21

telephone number because "We would like an
opportunity to speak with you by telephone to see if
you have any additional information to provide." (**See
exhibit F1** for a copy of Mr. Hartman's second letter.

70. On April 11, 2003 Mr. Moore sent a fax to Mr. Hartman
complaining about the length of time it was taking
for the owners of the Stearns to complete their
investigation. (**See exhibit G1** for a copy of Mr.
Moore's April 11, 2003 fax to Mr. Hartman,)

71. On April 30, 2003 Mr. Hartman sent a third letter to
Mr. Moore informing him that the investigation will
be concluded without having talked with Mr. Moore via
the telephone.

72. On May 7, 2003 Mr. Moore sent a second fax to Mr.
Hartman explaining that all communication between
each party should be made via written documentation
and not verbally over the phone so that a clear and
definitive record of each parties communications can
be verified.

73. On May 30, 2003 Mr. Moore sent a four page letter to
each one of the owners of the Stearns. The letter
provided a review of communication between Mr. Moore
and Mr. Hartman. The letter also stated that Mr.
Moore planned to go public on June 9, 2003 with
assaults and abuse that was committed against his
mother building owner's agents. Additionally Mr.
Moore planned to go public with the information that
the owner's of the Stearns had failed to conduct an
investigation into the abuse of Mrs. Moore. (**See
Exhibit H1-H4** for a copy of the May 30, 2003 letter
from Mr. Moore to the Stearns building owners.

22

74.  On June 9, 2003 Mr. Hartman sent Mr. Moore a letter
     representing the complete results of the five month
     investigation conducted by the Stearns Building
     owners. The results of the investigation were summed
     up in the following paragraph; "We have reviewed the
     actions of Federal Management Co. Inc. ("Federal"). We
     believe Federal acted reasonably, appropriately and in
     good faith concerning your mother's safety. We regret that
     you are dissatisfied with Federal's actions, and disagree
     with your assertions concerning false statements by
     representatives of Federal and wrongful intent of Federal
     and RHF in connection with this matter. "(See **Exhibit I1**
     for a copy of the June 9, 2003 letter from Mr.
     Hartman to Mr. Moore.)

### FACTS - THE BEST TEAM AND NEW ENGLAND MEDICAL CENTER

75.  The Boston Emergency Services Team (BEST) provides
     emergency psychiatric services for individuals who
     are judged to be mentally ill.

76.  Value Options oversees and hires the members of The
     BEST Team. Tufts-New England Medical Center has the
     state contract for the BEST Team.

77.  Mary Lou Moore had been a patient for many years at
     various clinics operated out of Tufts-New England
     Medical Center. Tufts-New England Medical Center is
     located a few blocks from the Stearns Building where
     Mrs. Moore lived.

78.  Mrs. Moore had an extensive medical history on file
     at Tufts New England Medical Center because of her
     many clinic and hospital visits over the years.

79.  According to the Triage Report filed by BEST TEAM
     employee Bill Almy, on April 22, 2002 at 1:21 PM Mary
     Gavin, identified as a "Case Manager", made a

23

telephone call to the Best Team and stated that Mary Lou Moore was an 86 year old female who is demented, disorganized, unable to care for herself, thinks she's in Alabama and continues to walk in traffic all day long. (**See exhibit J1**).

80. The first call that Mr. Moore made was to Boston Medical Center to confirm that indeed it was the BEST Team that had dispatched the ambulance to have his mother taken, involuntarily, to the BMC. Mr. Moore then called the BEST Team and was told that any information about Mrs. Moore would have to come from the Director of the BEST Team, Linda Young Sahovey. Mr. Moore tried to reach Ms. Sahovey by telephone and was unable to reach her.

81. Mr. Moore then went to the Best Team Headquarters which is located at the New England Medical Center, After several inquiries with various hospital personnel Mr. Moore was directed to the Emergency Room. Here Mr. Moore was given the name of Dr. Paul Allan Dagnes. I paged him and then left a message on his voice mail. Eventually Mr. Moore was given the directions to the department of Psychiatry and to the offices of Linda Sahovey and Paul Dagnes. Both offices were locked.

82. On April 26, 2002 Mr. Moore returned with a release for Mrs. Moore's medical records. A few days later Mrs. Moore's received her medical records. However the package mailed out by New England Medical did not contain any records or medical information or documentation about any of the events that happened on April 22, 2002. Nor was there any reference to the BEST Team. Nor was there any information about the authorization by NEMC employee Linda Young Sahovey's

24

written authorization to have Mrs. Moore
involuntarily taken from her home to the Boston
Medical Center for a psychiatric examination.

83.  Mr. Moore made another visit to the offices of the
BEST team to reach Linda Young Sahovey or Paul Dagnes
but was unable to contact either of them.

84.  Mr. Moore then went to the office of the President of
New England Medical, Thomas O'Donnell and requested
to meet with him. Mr. Moore was unable to meet with
Mr. O'Donnell. Instead the receptionist/office
assistant called for the supervisor in charge of the
medical records department to meet with Mr. Moore.
The medical records supervisor informed Mr. Moore
that because of company policy, NEMC would not
provide him with either a copy of the ambulance
report or the records from the BEST Team. Mr. Moore
was told to contact the Fallon Ambulance Company and
the BEST Team directly.

85.  Mr. Moore returned to the BEST Team offices which
were still locked. Mr. Moore decided to wait for
somebody to arrive. While waiting  a NEMC
receptionist paged another BEST Team doctor to meet
with Mr. Moore. The doctor advised Mr. Moore that the
BEST Team takes calls concerning emergency situations
that may require hospitalization of an individual.
The doctor advised Mr. Moore that once a call is
taken by a member of the BEST Team, a **strict protocol**
is initiated where a licensed psychiatrist on duty
makes a determination if the circumstances are so
serious and/or life threatening that hospitalization
and a psychological evaluation are needed. The doctor
assured Mr. Moore that only after following a strict
protocol is a "Section 12" instituted.

25

86. This doctor then walked down the hall to an office next to Linda Sahovey's office, knocked on the door and went inside. Although Mr. Moore remained outside, Mr. Moore looked into the office and saw what appeared to be either a telephone center, or a dispatch center. The doctor remained inside for ten to fifteen minutes. When the doctor came out it appeared to Mr. Moore that the doctor's demeanor and attitude had changed. The doctor told Mr. Moore that he was no longer at liberty to discuss the case with Mr. Moore nor provide Mr. Moore with the records he was requesting. Any additional information would have to come from Linda Young Sahovey

87. Mr. Moore went back to Mr. O'Donnell's office and was put in touch with Debra Smiler. Mr. Moore told Ms. Smiler about the situation and the refusal of the BEST team to provide a copy of the medical records and the conversation Mr. Moore had with the BEST Team doctor a few minutes earlier. Ms. Smiler called the BEST Team and spoke with the same doctor. However the doctor changed his story stating that he had refused to provide the medical records because Mr. Moore had no written authorization from his mother for the records. Mr. Moore told Ms. Smiler that the NEMC Medical Records division already had on file a written authorization from Mrs. Moore which had been submitted a few days earlier. Mr. Moore told Ms. Smiler that if this authorization were deemed inadequate, then a second separate authorization would be provided if necessary. Ms. Smiler stated that the authorization already on file with NEMC would suffice and that if the BEST Team needed an authorization for their files then she, Ms. Smiler

26

would make a copy of the one already in medical
records. Ms. Smiler told Mr. Moore that she would
call him when the paperwork from the BEST Team was
completed.

88. Mr. Moore received a call from Ms. Smiler a day or so
later and was told the issue of the authorization had
been cleared up, that she had spoken with Ms. Sahovey
and that Mr. Moore should contact Ms. Sahovey and
proceed from there. Mr. Moore again tried again to
reach Ms. Sahovey on the phone and was still
unsuccessful. Mr. Moore then called again to Ms.
Smiler who told him that she had done all that she
could and that he should continue to try and reach
Ms. Sahovey. A few days later Mr. Moore stopped by
Ms. Sahovey offices and found that she was in her
office. Ms. Sahovey informed Mr. Moore that she
couldn't meet with him. Ms. Sahovey stated that she
had received a call from Ms. Smiler instructing her
to make a copy of the BEST Team files concerning my
mother. Ms. Sahovey handed Mr. Moore documents and
left her office. The documents included a copy of the
Triage report. {**See exhibits J1-J3)**

89. The Triage report provided by New England Medical and
the BEST Team revealed the following information:

90. That Federal Management Employee Mary Gavin called in
a report to the BEST Team. That report stated that
Mary Lou Moore was demented, disorganized, unable to
care for self, thought she was in Alabama, continues
to walk out in traffic all day and that she has been
deompensating for two years.

91. However the Best Team Triage report also contains
medical information that directly contradicts the
information provided by Mary Gavin and Federal

27

Management. The triage report also includes the
following vital medical and psychological information
about Mary Lou Moore:

87.1 There is no abuse of any drugs.

87.2 There has never been any abuse of any drugs in the
medical history of Mary Lou Moore.

87.3 Mary Lou Moore is not considered to be dangerous.

87.4 Mary Lou Moore has showed good control of her
behavior.

87.5 Mary Lou Moore has no past history of violence.

87.6 Mary Lou Moore is not considered to be suicidal at
this time.

87.7 Mary Lou Moore reveals no suicidal ideas.

87.8 Mary Lou Moore has no suicidal plans of attempts.

87.9 Mary Lou Moore has no past history of suicidal
ideas or attempts.

92. In spite of this extensive medical information on
file with New England Medical Center and the BEST
Team, Linda Young Sahovey, NEMC employee and Clinical
Director of the BEST Program signed and issued a
"Section 12" dangerous person authorization to have
Mrs. Moore involuntarily forced out of her home and
taken to Boston Medical Center for a forced
psychiatric examination.

93. On February 6, 2003 Mr. Moore sent an extensive sixty
two page report on the abuse suffered by Mrs. Moore,
as a result of the illegal "Section 12", to the Board
of Directors of the New England Medical Center. A
copy of the report was also sent to the members of
the BEST Team, and to the principal executives at
Value Options. On behalf of his then eighty-six year
old mother, Mr. Moore demanded that the New England

28

Medical Center conduct a thorough investigation of
the events that lead to Mrs. Moore's being forced
from her home and forced to take a psychiatric
examination.

94.  In the "Section 12" report authorizing Mrs. Moore to
     be involuntarily hospitalized, the BEST Team states
     that Mrs. Moore was delusional, 'she thinks she's in
     Alabama and suicidal, 'continues to walk in traffic
     all day'. Yet no one from the BEST Team conducted any
     examination of Mrs. Moore, nor did they offer any
     reason why they did not examine her before stating
     these allegations as facts including them as evidence
     of mental illness. The only basis for this evidence
     was a single phone call from Federal Management
     Employee Mary Gavin. (**See Exhibit K1).**

95.  The standard of care by the BEST Team and New England
     Medical Center was established by the response of the
     BEST Team in the case of Jason Potter (**See exhibits
     L1, L2, L3 and M1, M2, M3)** According to these two
     reports which appeared in the Boston Globe,....
     "Potter was diagnosed with schizoaffective disorder
     and bipolar disorder in his mid-teens, and took the
     antipsychotic drug Zyprexa until he reached the age
     of 18, she said. Symptoms of schizoaffective disorder
     typically include delusions and hallucinations,
     combined with depression or mania." "Over the years
     that followed, he was hospitalized at Somerville,
     Bournewood, Charles River, and Westwood hospitals,
     among other facilities" according to his lawyer. When
     Potter and his parents sought help from the BEST
     Team, even with his parents agreeing to have Potter
     involuntarily committed - pink slipped - "the **BEST
     Team** member said it would be better to admit Potter

29

voluntarily." After two days in the hospital Potter
signed himself out only to be taken back to the BEST
Team by his mother a day later. "Rather than admit
him to a hospital immediately, the **BEST Team** sent
Potter home on Wednesday afternoon with a return
appointment for 1 p.m. (the next day.)," By the next
morning, Potter was under arrest on charges of
killing his mother and his stepfather.

96.  In the sixty-two page report that Mr. Moore sent to
     NEMC, The BEST Team and Value Options, Mr. Moore's
     demand for an investigation included very specific
     questions that he and Mrs. Moore wanted answers to.
     Those questions include the following:

   92.1  Is this the normal procedure for the BEST Team, to
         make a determination to issue a "Section 12" on
         the basis of one single phone call?

   92.2  If there is no other corroboration that is
         necessary, then how does the BEST Team know that
         the report is valid when the "Section 12" is
         issued?

   92.3  Once a "Section 12" is issued and an ambulance is
         sent to take an individual into involuntary
         custody, are there any additional safeguards built
         into the system so that the responders (EMT's) can
         actually make a visual and medical assessment of
         the accuracy and the scope of the situation, that
         they can make a "fail-safe" check to corroborate
         the validity of the situation BEFORE they actually
         take physical and involuntary custody of the
         individual?

   92.4  Are the EMT's required to check back with the BEST
         Team dispatch center at any time **prior** to arriving
         on the scene, **once** they have arrived on the scene

30

or **after** they are enroute to the hospital with the
patient secured and in hand?

92.5    Were there any communications between the EMT's
dispatched to pick up my mother and the dispatch
center before, during and after picking up my
mother?

92.6    Do the EMT's have any ability to make judgment
calls or are they required to follow the edicts of
the "Section 12" regardless of the circumstance
that they may find at the scene once they arrive?

92.7    And why did Ms. Sahovey refuse to provide me with
a copy of the "Section 12", the legal document
that authorized the involuntary commitment of my
mother?

92.8    Why wasn't a police officer dispatched to assess
the situation and validate that the information
being called into the BEST Team was accurate? **In
fact logic would have dictated that the police
should have been called** considering the facts that
were being alleged. An elderly woman walking in
the streets of Boston all day, in and out of
traffic. Why wasn't a call made to the police by
the dispatcher at the BEST Team since an elderly
woman is walking in and out of traffic attempting
to commit suicide. (The police would have gotten
the call **and responded immediately** to whatever
part of the city where Mary Lou Moore was suppose
to be wandering in the streets, in traffic. **Except
Mary Lou Moore was never wandering the streets, in
traffic. She was sitting in the lobby of her own
apartment building. And the police were never
called.** Why did the BEST Team dispatch an

31

ambulance to Mrs. Moore home if she was suppose to
be wandering the streets in traffic attempting
suicide?

97. Mr. Moore's report to the NEMC, to the BEST Team, and
to Value Options adds the following statement:

93.1 This whole idea of my mother wandering the streets
in traffic all day long is ludicrous, no rationale
person would ever have believed this story the way
it was presented to the BEST Team. An elderly lady
walking through the streets in traffic all day
would have been noticed by any number of people,
people driving in their cars as well as
pedestrians walking on the sidewalks. If an eighty
six year old woman was in fact wandering in and
out of traffic, someone have rushed to assist this
"lost and confused" old lady and taken her out of
harms way. They would have directed her to a
sidewalk bench. Or taken her to the closest store.
They would have tried to assist her in order to
keep her safe and out of harms way. They might
have tried to call a relative if they could
ascertain who that person might be. But there can
be no doubt, none whatsoever that the one call
that would have been made, in fact the first call
that would have been made would have been to the
Police. Absolutely no question whatsoever.

93.2 And there wouldn't have been one call, if this
lady had been walking in traffic all day, there
would have been numerous calls. You can be sure
about that. And just as important, there would
have been a record of any and all calls, both in
the written police log and as part of the
electronic recording log maintained of all calls

32

to the policed department. There would be a
verifiable record of the event(s). Without any
doubt. **And the police would have dispatched a car
to the scene right away.** And you can be sure some
passerby, or two or three would have stayed with
this lady until the police arrived. In fact this
lady would never have been able to walk in traffic
all day long without being noticed.

93.3 Which brings up the next logical question. Were
any such distressed calls made that day to the
police? If they were, when were they? And by whom?
There certainly would be a record. Not to mention
a record of when and to where the police would
have been dispatched.

93.4 Does the way in which the events of this day
unfolded sound even remotely credible? How could
this staff of medical professionals, The BEST
Team, ever come to believe and accept as true this
incredible story that an eighty six year woman
could possibly have gotten away with walking in
traffic all day, and not be noticed?

93.5 The story that my mother could have been walking
in traffic all day long and not have been noticed
is an impossibility. It could not have happened.
Period. No rationale person would believe that
this incredible story called in by Mary Gavin
could ever be true.

93.6 Which brings up the next important question: To
what location did the BEST Team dispatch the
ambulance? To the intersection of Tremont Street
and Stuart Street? The intersection of
Massachusetts Avenue and Boylston Street? To the
Mass Pike? To Route 93? On which stretch of

33

roadway does the ambulance get dispatched to pick up an elderly lady who, according to the report "continues to walk out in traffic all day long." It turns out that the ambulance gets dispatched to, of all places, the home of the individual in question. She's not walking the streets, but in the lobby of her own building. Doesn't this seem odd? And why wouldn't this seem odd to the person on the BEST Team that takes the initial report? Why didn't this seem odd to Linda Young Sahovey **before** she signs off on the "Section 12?"

93.7    If the dispatcher is told that the individual is sitting in their own building, then how is it that the dispatcher doesn't document exactly where this person is suppose to have wandered in the streets. In fact if the individual were not on the streets but in their own apartment building it is hard to imagine that the dispatcher wouldn't have documented exactly when and where these alleged incidents would have taken place. It is important to remember that the EMT's were not being dispatched to assess the validity of the situation, they were dispatched **after** they were already in possession of a "Section 12" which meant that their job was to, if necessary, restrain the individual and take them to the psychiatric ward.

93.8    The decision had already been made back at the BEST Team headquarters. And since the EMT's were dispatched to the my mother's building, it is logical to conclude that the BEST Team knew that my mother was at her own apartment building. Logic and routine protocol would dictate that there

34

would be documentation supporting the allegation
that my mother was wandering the streets, in
traffic all day long. Is there any supporting
documentation? **NO**! Entries should have been made
on the triage report supporting these allegations.
Are there any entries on the triage report
establishing the exact time, and the street
locations where Mary Moore was wandering in
traffic? Again the answer is, **NO!.**

98. On April 8, 2003 Thomas F. O'Donnell, President and
Chief Executive Officer of Tufts New England Medical
Center responds to the sixty-two page report sent by
Mr. Moore. Mr. O'Donnell's response is a two page
letter (**see Exhibits N1, N2**) The dozens of questions
that are contained in the sixty-two page report are
not addressed in the response by Mr. O'Donnell and
NEMC. No other response other than this two page
letter is ever sent to Mary Lou Moore or Christopher
Moore.

ADDITIONAL FACTS - FALLON AMBULANCE

99. Mr. Moore included a description of the role the
Fallon Ambulance Service played in the assault, abuse
and abduction of Mrs. Moore in the sixty-two page
report that was sent to the NEMC, the BEST Team and
Value Options. What follows is a part of that report:

95.1 The EMT's from the Fallon ambulance Service were
dispatched to pick up Mary Lou Moore with the
information contained on the "Section 12" report.
That information included the report, later shown
to be fabricated, that Mary Moore exhibited a
substantial risk of physical harm to herself by
evidence at attempts at suicide based on the
allegation that she continued to walk into

35

traffic. However when the Fallon EMT's located
Mrs. Moore, they found her in the lobby of her
apartment building, not on the city streets.
According to the written report documented by one
of the EMT's, they found Mrs. Moore "talking very
calmly" when they approached her. She was not
boisterous, agitated, out of control or showing
any symptoms which would lead the EMT's to believe
that she was going to hurt herself. She certainly
wasn't walking in traffic on the city's streets.
She was simply standing in the hallway of her own
apartment building. Because of the benign nature
of the situation, and because there was nothing
visible that even remotely connected this 86 year
old lady to the person described in the "Section
12" report, it is inconceivable that the EMT's did
not inquire further into the circumstances that
brought them to this location, and didn't inquire
further into the present health and well being of
the individual standing before them that day.

95.2   Is it conceivable that the EMT's wouldn't have
asked employees of Federal Management, who were
also at the location what they knew about Mrs.
Moore and the circumstances leading them to
believe she was at risk to commit suicide? Is it
conceivable that the EMT's wouldn't have asked
what were the locations, and on what streets was
she suppose to be walking in traffic? Is it
conceivable that the EMT's wouldn't have asked who
the person was that would have found Mrs. Moore on
the streets? Is it conceivable that the EMT's
wouldn't have asked who brought the woman back to
the building. Is it conceivable that the EMT's

wouldn't have asked how long had it been since
Mrs. Moore had been back in the building? Is it
conceivable that the EMT's wouldn't have asked if
Mrs. Moore had demonstrated any outward
indications that she was trying to hurt herself.
After all, the EMT's had observed a woman standing
in the hallway of her own apartment building, the
building where she in fact lived, who was talking
very calmly when the EMT's arrived, in the same
manner that someone would who had come from their
own apartment to the hallway of their own
building. This woman had exhibited no irrational
or peculiar behavior. Is it conceivable that the
EMT's wouldn't have asked some background
questions to corroborate that in fact this woman
posed a danger to herself? Isn't that in fact part
of the responsibilities of any EMT that when they
arrive on the scene to gather as much information
as possible so as to correctly assess the
seriousness and the gravity of the situation in
order to make the correct diagnoses and treatment.
As the first responders aren't EMT's depended upon
to provide the receiving hospital with an initial
report on the patient and the circumstances in
which they found them? In fact aren't they
regularly in radio contact with the hospital? And
in this case wouldn't they have also been in radio
contact with a member of the BEST Team? And
wouldn't they have been in radio contact with the
dispatcher at the Fallon Ambulance Service
headquarters? And yet, going by the one page
report provided to me by Fallon, there was no
radio communication with the receiving hospital -

37

Boston Medical Center. There was no radio
communication with the BEST Team. And there was no
radio communication with anyone at Fallon.

95.3   In addition there was no indication that the EMT's
bothered to ask any background questions about
where this woman was walking in traffic, who found
her, how long had she been on the streets, how did
she get back to her place of residence. No
questions at all. And therefore no confirmation by
the EMT's that Mary Lou Moore was ever walking in
traffic and therefore had suicidal tendencies.
Here is how the EMT's described their actions that
day when they came upon Mary Lou Moore standing in
the hallway of her own apartment building.

95.4   *Patient standing in way of apartment complex.*
*Patient talking very calmly but refusing to get on*
*the stretcher. Staff members also try to convince*
*patient to get on stretcher. Finally we had to*
*resort to a rapid taking by extremities. Patient*
*got extremely angry and started hitting EMT's.*

95.5   I talked to my mother after her return home from
the hospital that day. She told me that she was in
her apartment all morning. She told me that she
never went out onto the city streets and was never
walking in traffic. In fact my mother never even
left the building that day. As my mother has
gotten older the farthest that she goes is the
inside lobby of her apartment building, usually to
sit on the bench with other elderly residents.
And my mother's demeanor is always pleasant, her
conversation with everyone, stranger and friend,
is always cordial, never threatening, never loud,
always calm. Which is exactly how the EMT's found

38

her that day, in the hallway of her own home, talking very calmly. On what basis, with what evidence did the EMT's make their judgment that Mary Lou Moore was at risk to harm herself? In fact all indications pointed to the opposite, that this was an elderly lady, non threatening, in control, in her own home environment. The EMT's approach her and tell her to get on a stretcher. She refuses. This would be a natural reaction for anyone who is approached by two strangers. Staff members from the management company at the Stearns intercede and tell my mother to get on a stretcher. Why? For what reason? My mother isn't sick. She hasn't done anything other than come out of her apartment and into the lobby as she has most every day for the past twenty one years. Of course my mother could not have known that Federal Management employees had fabricated a story about her wandering the streets in traffic. She has no idea what is going on. When she refuses to get on a stretcher, the EMT's decide to rush at her and subdue her -"rapid taken by extremities"- grabbing her by her hands and feet. My mother is being accosted and assaulted. She becomes angry and tries to hit her assailants. Which is exactly what anyone, elderly or not, would do in a similar situation. But being an 86 year old woman the EMT's overpower this woman and get their way. They hoist her on a stretcher and immobilized her by tying her up in restraints. Again the question is why?

95.6   The EMT's obviously were acting solely on the information provided in the "Section 12" and

39

whatever information given them by the employees
of Federal Management. There is no independent
confirmation of any of this information. Again my
mother wasn't found by the EMT's on the streets
walking in traffic. She wasn't belligerent,
hysterical or out of control or exhibiting any
outward signs of someone likely to harm themselves
of anyone else. In fact nothing, nothing that the
EMT's personally observed would substantiate
either the information provided by Federal
Management, or the information contained on the
"Section 12".

95.7  By the time that the Fallon EMT's have assaulted
and tied up Mary Lou Moore, no one has ever seen
and had independent corroboration that she was
ever walking the streets in traffic. No one has
even seen her outside of her own apartment
building. Not the EMT's. Not any member of the
BEST Team. And no one from Federal Management. And
yet Mary Lou Moore is now enroute, involuntarily,
to the psychiatric unit of the Boston Medical
Center for a psychological examination with a
possible forced commitment and hospitalization.
She is frightened beyond belief. She has no idea
who these people are and where they are taking
her. Her emotional state has been shattered. And
no one will listen to her. This is an eighty six
year old woman who has high blood pressure, has
had heart problems and has had a stroke in the
past. The only thing she did wrong was to come out
of her house into the lobby of her own apartment
building." (End)

100.  **See Exhibit B1** for copy of report by Fallon EMTs

WHEREFORE, the plaintiffs demand judgment against the defendants for compensatory and punitive damages plus interest, costs and attorney's fees, and such other relief as this court deems necessary, proper and just.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Respectfully Submitted

Christopher A. Moore

Respectfully Submitted

Estate of Mary Lou Moore
Christopher A. Moore, Administrator

41

**USMS**
**SCREENED** UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Christopher A. Moore           )
    Plaintiff                 )
                              )
                              )
MARY LOU MOORE ESTATE          )
    Plaintiff                 )
                              )    **EXHIBITS FOR AMENDED COMPLAINT**
V.                             )    **NO:05-10853-MLW**
                              )
10 TEMPLE PLACE LIMITED        )
PARTNERSHIP, VALUEOPTIONS)
INC., RONALD I. DOZORETZ,)
THOMAS E. ORAM, REBECCA        )
H. WHITE, MICHAEL A.           )
TAYLOR, NEW ENGLAND            )
MEDICAL CENTER HOSPITALS,)
INC., LINDA SAHOVEY,           )
MARSHAL FOLSTEIN, ELLEN        )
ZANE, CHARLES STREET RHF )
HOUSING, INC., LAVERNE R.)
JOSEPH, STEPHEN J.             )
MARGETIC, LINDA LISTOE,        )
JOHN E. TRNKA, DONALD W. )
KING, FALLON SERVICE,          )
INC., TIMOTHY J. FALLON, )
FEDERAL MANAGEMENT CO.         )
INC.; BETTE ANDERSON           )
FISH, GILLIAN GATTE, MARY)
GAVIN, DAVID CROSS, ALLEN)
PERKINS, RICHARD HENKEN, )
STEPHEN WILCHINS               )
    Defendants                )

Respectfully Submitted

Christopher A. Moore

2006 SEP 11 ⊂ 5: 55

**BOSTON MEDICAL**

Exhibit A1

## EMERGENCY DEPARTMENT NURSING DOCUMENTATION

| TIME: 1435 | DATE 6/23/02 | DOB / AGE | 86 | |
|---|---|---|---|---|

**MODE OF ARRIVAL:** ☒ EMS COMPANY _Fallon_  ☐ WALK IN

**ACCOMPANIED BY:** ☐ PARENT / GUARDIAN  ☐ FAMILY
☒ ALONE  ☐ FRIEND  ☐ DSS
☐ OTHER _social worker_

☐ EMERGENT
☐ URGENT
☐ NON - URGENT
☐ X - PRESS

_Mrs. Las Mon_

**PRIMARY LANGUAGE:** ☒ ENGLISH  ☐ SPANISH  ☐ FRENCH  ☐ PORTUGUESE  ☐ CREOLE:
☐ OTHER:  ☐ INTERPRETER NAME _____  TIME BMC INTERPRETER CALLED:

**PRE-HOSPITAL TREATMENT:** ☐ C -SPINE IMMOBILIZATION  ☐ O2  ☐ NEBULIZED MEDICATION # NEBS: ____
☐ N/A  ☐ DSG  ☐ ICE  ☐ SLING  ☐ SPLINT  MEDICATION: ____
☐ IV:  SITE: ____  SIZE ____  ☐ OTHER INTERVENTIONS: ____

**TRIAGE NOTE** c.c. _psych eval._

**H.P.I.**
_Pt presents to ED via ambulance accompanied by a social worker + being found wandering into the streets._

BP 98  HR 84
RR 18
O2 SAT
TEMP

☐ LOCATION OF PAIN: ____
☐ PT DENIES PAIN  PAIN RATING: (circle)  1  2  3  4  5  6  7  8  9  10
AT THIS TIME  FACIAL SCALE RATING:  (SEE BACK OF FORM)

WT

**PHYSICAL ASSESSMENT**

_Dementia
HTN
Lyme disease
Angina_

**PRIMARY SURVEY**  ☐ YES  ☒ NO

| | AIRWAY | BREATHING | CIRCULATION | C-SPINE | DISABILITY/NEURO | MENTAL STATUS | |
|---|---|---|---|---|---|---|---|
| N O R M A L | ☒ NO OBVIOUS ABNORMALITIES  ☒ PATENT | ☒ NO OBVIOUS ABNORMALITIES | ☒ NO OBVIOUS ABNORMALITIES | ☐ N/A  ☒ DENIES PAIN | ☒ NO OBVIOUS ABNORMALITIES  ☒ ALERT  ☒ PERRL | ☒ ORIENTED X3/WNL for age  ☒ ABLE TO PROVIDE TRIAGE HX | _Unchanged_ |
| E X C E P T I O N S | ☐ NON-PATENT  ☐ DROOLING  ☐ STRIDOR  OTHER: | ☐ APNEIC  ☐ LABORED  ☐ RETRACTIONS  ☐ SHALLOW  ☐ NASAL FLARING  ☐ WHEEZING  ☐ GRUNTING  ☐ HYPERVENTILATING  OTHER: | ☐ PALE  ☐ CYANOTIC  ☐ DIAPHORETIC  ☐ MOTTLED  ☐ SKIN COOL  ☐ CAP REFILL > 2 SECS. | ☐ PAIN ●  ____  OTHER: | ☐ RESPONDS TO VERBAL COMMAND  ☐ RESPONDS TO PAIN  ☐ NO RESPONSE  PUPILS  R ____  L ____  ☐ FACIAL DROOP  ☐ ALTERED MOTOR Fx  ☐ ALTERED SENSORY Fx  OTHER: | ☐ DISORIENTED  ☐ HALLUCINATIONS  ☐ LETHARGIC  ☐ POST-ICTAL  ☐ IRRITABLE  ☐ OUT OF CONTROL  ☐ COMBATIVE  ☐ ANXIOUS  ☐ AGITATED  ☐ WITHDRAWN  ☐ SAD  ☐ CRYING  ☐ ANGRY  ☐ SLURRED SPEECH  OTHER: | _NKA_  _No_ |

**TRIAGE INTERVENTIONS**  ☐ NONE INDICATED AT THIS TIME
☐ ICE  ☐ ELEVATION  ☐ WHEELCHAIR  ☐ MD NURSE NOTIFIED
☐ SPLINT  ☐ C - SPINE IMMOBILIZATION  ☐ INITIATED  ☐ MAINTAINED
☐ DSG  ☐ BLEEDING CONTROLLED  ☐ PROJECT ASSERT
☐ X - RAY  ☐ GLUCOMETER:  ☐ URINE DIP
☐ P.O. FLUIDS  ☐ URINE BAG  ☐ URINE HCG: ____  ☐ QC O.K.
☐ BROUGHT DIRECTLY TO TREATMENT AREA  ☐ ANTIPYRETICS
☐ OTHER: ____  (Document under Physician orders)

**TRIAGE LABS OBTAINED**
☐ T&S
☐ CBC  ☐ DIFF
☐ SHCG
☐ LYTES
☐ LFTs
☐ CARDIAC PANEL
☐ OTHER ____

IMMUNIZATIONS
LAST TD
CONSULTATION
☐ YES

| TRIAGE NURSE: | PRINT: _C. Berg_ | INITIALS: |
|---|---|---|
| RN SIGNATURE: | PRINTED NAME: | INITIALS: |
| RN SIGNATURE: | PRINTED NAME: | INITIALS: |

999159 Rev 6/01

# Fallon

**FALLON AMBULANCE SERVICE, Inc.**
95 Eliot Street   P.O. Box 66, Milton, MA 02187-0066
web site: http://fallonambulance.com

| Date 4 22 02 | CC # 57641 | Incident # | Unit # 114 | | Medical Record # |
|---|---|---|---|---|---|

| Name Marilou Moore | Attendant | EMT Level | TIMES | BLS | ALS | Mileage |
|---|---|---|---|---|---|---|
| | 1. (D) Maman | (B) | UA | | | |
| Home Address | 2. Carr | | UE | 1206 | | |
| 10 Temple Place | 3. | | AS | 1343 | | Start Mileage |
| City, State Boston, Ma   Zip | CATEGORY / EQUIPMENT USED / CALL TYPE | | PC | | | |
| Home Telephone   Business Telephone  N/A | EMT-A / Oxygen / Emergency Admission | | DS | 1425 | | |
| | EMT-I / I.V. Pump Monitor / Discharge Outpatient | | AH | 1433 | | End Mileage |
| Dispatch Priority   Trans Priority 3 | EMT-P / Ventilator / One Way | | CL | | | Total Mileage 2 |
| | ANCILLARY PERSONNEL / Inventor / Round Trip | | | | | |
| Sex F   Age 86   Date of Birth 7/11/16 | Social Security # 421 72 3022 | | Discharge Nurse  Section 12 | | | |
| Responsible Party William Moore | Medicare # | | Chief Complaint | | | |
| Address 15 Devon St | Medicaid # | | EMS Clinical Impression CHOx2 | | | |
| City / State Dorchetter, Ma | Medex # X X A 0 0 | | Discharge Diagnosis | | | |
| Home (781) 442-312 | Other Insurance Company Name | | Nurse Richard | | | |
| Pick Up Location 10 Temple Place   City/Town | Address | | Employer | | | |
| | Policy # | | | | | |
| Receiving Facility BMC Ramon ER | Reason for Transport Section 12 | | Credit Card Visa MasterCard Discover American Express Number: | | | |

**OFFICE USE ONLY:**

Narrative 86 y/o ♀ Section 12 y/a found CHOx2 pt standing in lobi of apartment complex. Pt talking very calmly but refusing to get on the stretcher. Staff member also try to convince pt to get on stretcher finally we had to resort to a rapid taken by extremities. Pt got extremely agitated and started hitting EMTs pt transported c BPD charge. Or incident report given to staff. Pt sheet lifted to ER stretcher pt left in care of staff.

Past Medical Hx: Dementia, ? Lymme Disease, HTN, Angina
Medications: None    Allergies (Unknown)

| Vital Signs | | | | | |
|---|---|---|---|---|---|
| Time | pt refused vitals | | | Time | |
| LOC | | | | Location | |
| Pulse | | | | Blood Drawn | |
| BP | | | | Fluid | |
| Respiration | | | | Needle size | |
| Pupils | | | | Rate | |
| Blood Glucose | | | | EMT I/P | |
| SPO2 | | | | | |
| Airway | | | | Airway Management | |
| Oxygen | | | | ETT Time | ETT Size |
| EKG | | | | Route | Bilateral BS |
| | | | | Intubated by | Confirmed by |

| Medication Administration | | | | | |
|---|---|---|---|---|---|
| Time | | | | | |
| Med | | | | | |
| Dose | | | | | |
| Drip Dose | | | | | |
| Route | | | | | |
| EMT-P | | | | | |

| EMT P 1 #: | EMT P 2 #: | Communication: CMED   Channel | MD Name: (print) |
|---|---|---|---|
| EMT (print) | | Cellular   Landline   Call back # | MD Name: (sign) |
| EMT (sign) | | white– service;  yellow– hospital; pink – EMS CQI | |

Exhibit C1

# FEDERAL MANAGEMENT CO., INC.

175 FEDERAL STREET, SUITE 7
BOSTON, MASSACHUSETTS 021
TEL: (617) 482-8925 • FAX: (617) 338-85

June 14, 2002

Mr. Christopher Moore
141 Intervale Street
Dorchester, MA 02121-2027

Dear Chris,

I am glad we all had the opportunity to meet to discuss your mother's situation. It was unfortunate your mother was not able to be with us. I hope the meeting resolved some of your concerns regarding Federal Management's unease about your mother's well being. I want to reiterate that what you interpreted as interference in your mother's independence was only our fear that she is going to come to harm because of her disorientation at various times as witnessed by both Mary Gavin and Allen Perkins.

I know you will be following up our discussion yesterday with someone at Elders at Risk, the agency that had your mother taken to the hospital previously. I would appreciate your keeping us apprised of your mother's situation so we can all feel comfortable that your mother is safe in her environment.

Please do not hesitate to call any of us regarding any questions or concerns you have. We, in turn, will call you regarding any problems we may notice your mother having in the future.

Sincerely,

Bette J. Anderson, CPM
President

cc:    Donna Bronk
       Allen Perkins
       Mary Gavin



Exhibit D1

July 3, 2002

Ms. Bette J. Anderson
President
Federal Management Company, Inc.
175 Federal Street; Suite 700
Boston, MA 02110

Dear Ms. Anderson:

This letter is a follow up to our meeting of June 13, 2002, a meeting that I had requested in my May 21, 2002 letter to you. I am also in receipt of your June 14, 2002 letter to me, following up on the same meeting. The purpose of my writing this letter is to focus on several areas that have been, and continue to be of enormous concern to me as it relates to my mother, her tenancy at the Stearns Building, as well as the events of April 22, 2002. That was the day my mother was forcibly restrained and taken against her will out of the lobby of the Stearns building and brought to the Boston Medical Center. This event was witnessed by members of your staff. I will also use this letter to review the specific "safety" issues presented by you and your staff, as well as a review of Federal Management's stated "unease" about my mother's well being. Finally I will address the reasons why I made the decision that my mother should not attend the meeting on June 13. I will also explain my anger and my objections to your having invited to the meeting, without my prior knowledge, an employee from an outside social service organization that provides my mother with some of her services.

### The allegation of my mother wandering in the street, in and out of traffic, all day long.

The first issue I brought up at our meeting concerned the allegation that my mother was ever seen wandering the streets of Boston, in and out of traffic, all day long.

**Question from Chris Moore:**
> **Did any staff member at Federal Management ever see my mother, wandering the streets, in and out of traffic?**

**Federal Management's Answer:    NO!**

**Question from Chris Moore:**
> **Does anyone from Federal Management possess any information that my mother was ever wandering the streets, in and out of traffic, all day?**

**Federal Management's Answer:    NO!**

This question was one of the most important that needed to be clarified by you, your regional manager Donna Bronk, your property manager Allen Perkins and your resident coordinator, Mary Gavin. Let me add that during the course of our June 13th meeting I asked this question several times. And each time the answer that came back from each person at the meeting was

(E Arhibit 02)

the same. My mother was never seen wandering the streets, and was never seen wandering in and out of traffic. In fact Mr. Perkins acknowledged that he had never seen my mother alone outside of the Stearns building. Which only left Ms. Gavin who stated that she had once happened upon my mother outside of the Stearns building sometime last year. Ms. Gavin further stated that she found it necessary to provide my mother with assistance in finding her way back home. This is suppose to have happened on one single occasion, sometime last year.

If we are to accept Ms. Gavin's version of events, this encounter would have occurred before Federal Management took responsibility for the Stearns Building, at a time when Ms. Gavin was employed by the previous property managers. Ms. Gavin, however, was not suggesting that she found my mother wandering the streets, in and out of traffic. Just that she saw my mother one day while she, Ms. Gavin also happened to be outside. The real problem with Ms. Gavin's newly remembered revelation is that it implies a safety issue with my mother, and as such needs to be further examined.

In the last few weeks I have taken the time to talk with several of my mother's neighbors who frequently sit in the lobby. Each tenant with whom I have spoken recalls seeing my mother either sitting by herself, or sitting with other tenants on the bench which is located in the inside lobby of the building. This is consistent with what Mr. Perkins has stated. Only Ms. Gavin has stated that she happened upon my mother somewhere along Tremont Street, sometime last year and had to help my mother find her way back home. How interesting. And how convenient that Ms. Gavin should only now recall this incident.

And yet if this encounter really happened the way Ms. Gavin suggests, why is it that Ms. Gavin never mentioned this happenstance encounter until now? Why did she wait until this crucial meeting, at a time when Ms. Gavin was, in my view, struggling mightily to document any record of safety problems that she had witnessed with regards to my mother. Having publicly admitted that she had never witnessed my mother wandering in the street, never saw my mother wandering in and out of traffic, suddenly Ms. Gavin recalls an incident that might be used to bolster her argument about her concerns for my mother's safety. And even though Ms. Gavin is not now suggesting that my mother was wandering in the street, or in and out of traffic, this convenient and timely memory recall on her part bears further scrutiny.

No one except Ms. Gavin witnessed this chance encounter, so we only have Ms. Gavin's word that it actually occurred. My mother doesn't recall any such meeting at all. Ms. Gavin claims that this chance encounter is suppose to have happened sometime last spring, or sometime last summer, or perhaps it was in the fall. The time and date could not be recalled by Ms. Gavin. I am left to wonder then; did my mother first happen to see Ms. Gavin and state that she was unable to find her way home and needed assistance? Or did Ms. Gavin happen to spot my mother and, fearing for my mother's safety, help bring her back home? Or could it be that Ms. Gavin just happened upon my mother while they both were walking to the Stearns and, since they both were heading in the same direction, all that might have happened is that they accompanied each other back to the building. It is hard to know exactly what happened during

Bette J Anderson    Exhibit D3    July 3, 2002

this chance meeting. Assuming the sidewalk meeting happened at all. Which is a very big assumption.

One fact though is not in dispute, however. **Ms. Gavin never told anyone in my family about the incident at the time it supposedly took place!**

If Ms. Gavin had really found my mother unable to find her way home sometime in the middle of last year, why didn't she tell me about it at the time? I saw Ms. Gavin dozens of times last year. She has my telephone number so getting in contact with me would not have been a problem. Failing that, she could have contacted my sister Naomi who also frequently came to see my mother. It is hard to believe that Ms. Gavin would not have informed one of us at the time of the incident, if this had really happened the way Ms. Gavin suggests that it did.

### The importance of providing the date and time of this supposed encounter

The fact that Ms. Gavin could not recall the time of day, the day of the week, or the month when this was suppose to have taken place is also problematic. By not pinning down the time and date, I cannot ascertain whether my mother could even have been out and about as Ms. Gavin states that she was. As Ms. Gavin is aware, I frequently come to see my mother at various times during the week. And last year I took my mother out of the building for several days at a time on different occasions. My sister Naomi was also a frequent visitor. As was my brother William. My mother also has a nurse and a home health aide who are assigned to be with her on a regular basis. Add to that the telephone calls that are frequently made to and from my mother, by her sister, her daughter, as well as other family members. With this considerable level of interaction, I could have determined if it were even possible for my mother to have been in the location where Ms. Gavin suggests that they had their encounter. But Ms. Gavin cannot pinpoint the time of day, or the day of the week, or even the month when this encounter is suppose to have happened. Of course none of this backtracking would even have been necessary if Ms. Gavin had reported this alleged incident either to me or my sister at the time it was suppose to have happened. But she did not. Not until our meeting on June 13 when she badly needed to come up with at least one example of a "safety" concern.

### The January 7, 2002 letter from Ms. Gavin to me.

On January 7, 2002 Ms. Gavin wrote the following in a letter to me:

> "I would like to take this opportunity to inform you that on Sunday, January 6,
> 2002 Leslie Rosenberg, resident of the Stearns saw your mother Mary Lou
> Moore wandering in the lobby with her hat and coat on. Leslie Rosenberg was
> afraid for Ms. Moor (sic) but was able to guide her back to her apartment."

By writing this letter when she did Ms. Gavin, and Federal Management clearly wanted to establish not only the date of the incident, but also the exact date that notice had been provided to me. By doing this Federal Management established a clear protocol about how

Bette J Anderson    ( Exhibit D4 )    July 3, 2002

incidents should be documented, and notice given. And by selecting and documenting something as incidental as a neighbor meeting my mother in the safety of the Stearns apartment building, Ms. Gavin made clear how important any perceived "safety" risk was to her. Ms. Gavin elevated what can only be described as a kind gesture on the part of two neighbors, to the level of a major concern warranting documentation and written notice, even though the safety aspect of the incident is highly questionable, and that's assuming that the events as described in the January 7 letter are correct.

It is also significant to note that this incident is suppose to have happened on a Sunday, January 6, 2002. By documenting this incident in a letter on January 7, just one day later, Ms. Gavin clearly indicates how much of a priority she attaches to any incident that she believes to involve an issue of safety, and the need to make sure that I was provided notice about it.

This attention to documentation, as evidenced by her January 7 letter, further undermines Ms. Gavin's story that she happened upon my mother and wound up helping her find her way back to the Stearns building. If Ms. Gavin felt it was such a necessity to inform me, in writing, about my mother being redirected back to her apartment by a neighbor - an incident that took place within the safety of my mother's apartment building - then it logically follows that Ms. Gavin would have taken the time to have informed me of a much more serious incident of my mother not able to find her way home while walking in the neighborhood outside of the Stearns building. But as has been stated, Ms. Gavin did not inform either my sister or me, either verbally or in writing, at the time of this supposed incident. And just as important Ms. Gavin did not bother to inform either my sister or me in the many months that have passed since this incident was suppose to have happened.

When she wrote the letter on January 7, Ms. Gavin clearly established how very deliberate and very precise she is when informing me of safety issues that relate to my mother. The fact that she didn't last year adds up to another reason why I question whether or not this sidewalk encounter ever took place. How can one explain such an attention to detail on January 7, 2002, one day after an inconsequential hallway meeting, but never bothering to bring up the much more serious event when my mother was suppose to be lost on the city streets? Never mentioning it to anyone in my family. Not bothering to write a letter. Not recalling it at all until now, months later. This sudden "memory" recall only surfaces at a time when I have demanded examples of "safety" issues that would have warranted the excessive monitoring of my mother by members of your staff. Frankly this sudden memory recall of an event sometime last year just has too many holes in its logic; it is just too hard for me to accept.

It should also be noted that neither Ms. Gavin, Mr. Perkins nor anyone else at Federal Management has ever documented any other specific safety issues. It is therefore reasonable to assume that none of these individuals were witness to, or were provided with any information about, any other safety concerns, at least not any that rose to the level of seriousness that Ms. Gavin documented in her January 7, 2002 letter.

Bette J Anderson    $\boxed{\text{Exhibit D5}}$    July 3, 2002

### Mary Gavin's January 7, 2002 letter (continued)

Ms. Gavin's written admonition to me, barely two weeks after Federal Management took control of the Stearns, raises several other issues of concern. First; the apparent requirement by your company that my mother register in an adult day health program. Second: Ms. Gavin's warning that we, my mother's family, needed to devise a plan to protect my mother's tenancy at the Stearns. Until her January 7 letter I had no idea that my mother's tenancy was at risk. It had never been at risk during the twenty one years my mother had been a resident of the Stearns, prior to the arrival of Federal Management. But now, with your company firmly in charge, my mother's tenancy was now considered at risk.

At our meeting on June 13, five months after this January 7th letter, you agreed that Federal Management has no authority to interfere in my mother's daily activities and has no right to dictate how she comes and goes. That statement is fine coming as it did on June 13. But consider that it took action on my part to compel you to state this position. Until I wrote my May 21, 2002 letter, which resulted in the June 13 meeting, <u>Federal Management's written policy</u> was to insist that my mother comply with your directives under the threat of putting her tenancy at the Stearns "at risk."

You also stated in your letter of June 4, 2002 that your company is not in the business of throwing people out into the streets. And yet until I sent the May 21, 2002 letter to you, which resulted in our subsequent meeting, that threat was very real to my mother and me. In other words, if I hadn't provided adequate documentation and demanded a meeting with your office, this policy of interference and threats to my mother's tenancy was very much your written policy, and was reconsidered only as a result of actions on my part. I have never received any notice that this policy had been reconsidered prior to our June 13th meeting.

### Federal Management's firm belief in Mary Gavin's credibility

Both you and your assistant Donna Bronk made it clear during our meeting that neither of you had any first hand knowledge of any of the events that had been raised about my mother. You relied exclusively on the information provided by Ms. Gavin and Mr. Perkins. Yet Mr. Perkins did not speak during the first half of the meeting. It was Ms. Gavin who spoke and provided all of the details about the problems, as she perceived them, with my mother. Your follow up letter on June 14 failed to mention that during the time, and right after Ms. Gavin spoke, she and I got into a fairly heated argument about the accuracy and the veracity of her statements. In fact you personally had to intervene, on more than one occasion, to try to lower the obvious tension in the room between the two of us.

As stated, during this meeting on June 13, I questioned the veracity of Ms. Gavin's statements. Very little of Ms. Gavin's assertions can be independently verified. Everything of significance was witnessed by Ms. Gavin alone, such as her assertion that she helped my mother home safely sometime last year. Most of the events alleged by Ms. Gavin occurred before Federal Management became the property managers on December 21, 2001. And even though Ms.

Bette J Anderson

( Exhibit D+ )

July 3, 2002

Gavin produced no documentation to support her allegations - she recalled everything from memory - Federal Management made the decision to accept Ms. Gavin's statements as being both truthful and credible. Which explains why Federal Management felt confident enough to threaten my mother's tenancy on January 7, 2002, less than two weeks after taking control of the Stearns. Federal Management depended almost exclusively on the word of Ms. Gavin, a brand new employee to Federal Management who had only been on the job for two weeks.

I raised this very issue of Ms. Gavin's credibility when I questioned how your company could have such confidence in Ms. Gavin's information. Your replied that it was only natural to draw on the knowledge of an employee who had prior experiences with my mother. In other words, Federal Management was predicating its knowledge about my mother not only on the observations of your property manager Allen Perkins, but also on the veracity of Ms. Gavin. I make note that during the meeting you never once questioned the accuracy of any of the information put forth by Ms. Gavin. You believed that Ms. Gavin brought with her a considerable knowledge of my mother's past history which you considered extremely helpful in your evaluation of my mother.

### Responsibility of the Elders at Risk Agency for removing my mother from the Stearns

You stated in the June 13, 2002 meeting, and again in your June 14, 2002 letter, that it was the agency Elders at Risk that had my mother removed from the lobby of the Stearns Building on April 22, 2002. Also during the meeting Ms. Gavin acknowledged that she was present when my mother was forced into the ambulance by the EMT's (Emergency Medical Technicians) who had been dispatched to the Stearns building. Since Ms. Gavin stated that she had been called to the lobby to help resolve the situation, why didn't she advise the EMT's or their superiors of the crucial facts, facts that she and Mr. Perkins now acknowledge, that no one at Federal Management had ever seen my mother walking in and out of traffic all day long. Ms. Gavin and Mr. Perkins knew this allegation to be false. Why didn't Ms. Gavin communicate this information to the EMT's before they forced my eighty six year old mother into the ambulance? **And why didn't Ms. Gavin make a telephone call to me or my sister while all of this was happening to my mother? This incident, after all, took place in the lobby of the Stearns building, not on the city streets. The building where my mother is a tenant!**

After my mother was taken away, what were the reasons why Ms. Gavin followed my mother to the hospital? Once at the hospital, why did Ms. Gavin identify herself to the doctors and the nurses as my mother's social worker? And why didn't Ms. Gavin advise those same doctors and nurses that neither she, nor any other staff member at Federal Management had ever seen, or had any knowledge of my mother ever wandering the streets, in and out of traffic?

### Ms. Gavin's lack of credibility

As you have made clear, you have a lot of confidence in the words and actions of Ms. Gavin. But from what I can determine, there are too many inconsistencies, too many questions that surround Ms. Gavin's statements.

Bette J Anderson

Exhibit D

July 3, 2002

- Ms. Gavin states that she saw my mother sometime last year and helped bring her home but didn't bother to tell anyone for many months, that is until now, for the very first time.
- Ms. Gavin did not tell the EMT's or the doctors and nurses what she knew to be true, that neither she nor any other staff members at the Stearns had ever seen my mother wandering the streets, in and out of traffic. This information was critical because it was the basis for forcing my mother to undergo a psychiatric examination.
- Since Ms. Gavin did not provide accurate and critical information to the medical personnel, why then did she follow my mother to the hospital at all?
- Once at the hospital why did Ms. Gavin identify herself as my mother's social worker.

As a result of these and other issues, I have serious questions about Ms. Gavin's credibility and I did not find her answers to be truthful.

### The "safety" concerns raised by Allen Perkins, Property Manager for the Stearns

Mr. Perkins was asked to detail his "safety" concerns about my mother about halfway into the meeting. Before he did, Mr. Perkins made reference to my May 21, 2002 letter where I stated that I had met with Mr. Perkins on two previous meetings. Mr. Perkins wanted to make clear that, from his viewpoint, the second meeting between the two of us, which occurred on a day when I was leaving the Stearns building; this second meeting was not the meeting that he had requested in his Feb. 1, 2002 letter to me. I disagreed and told him that I considered our second meeting to be our second meeting. His letter requested a second meeting. We met a second time. The fact that the meeting was brief, and that very little was resolved, is not the point. Our first meeting was a fairly brief one as well.

During our second meeting I concluded that Mr. Perkins' attitude toward my mother was no different than it had been during our first meeting. In my opinion Mr. Perkins believed my mother was ill suited to continue to stay at the Stearns. I felt otherwise. I didn't think a longer meeting was going to change his mind. It certainly wasn't going to change mine.

I now make note of a change, perhaps significant, perhaps not. This change took place between the time when Mr. Perkins sent his letter on February 1, 2002 and the meeting that took place on June 13. This change involves the number of staff members who apparently had serious concerns about my mother's safety. Here is how Mr. Perkins outlined those concerns in his February 1, 2002 letter to me. (The underling of words for emphasis was done by me.)

> "As you are aware, since we have spoken briefly on a previous occasion, *I along with several members of our staff have some serious concerns about your mother's safety*. I would like to set up a meeting with you and any other family members who might be interested in attending. The purpose of this meeting would be to share our concerns and to gather input from your family as to how you plan to deal with these situations."

Bette J Anderson                    Exhibit 08                    July 3, 2002

Mr. Perkins' letter stated that several other staff members also had "safety" concerns about my mother. Yet in our meeting on June 13, there were only two staff members in attendance, Ms. Gavin and Mr. Perkins. Only Ms. Gavin and Mr. Perkins voiced any "safety" concerns about my mother. No other staff members were there to voice concerns. Perhaps my previous documentation of another alleged incident can help explain why several staff members became two staff members. Or perhaps Mr. Perkins meant two staff members all along.

In my May 21, 2002 letter to you I outlined an incident where David Cross, your building Superintendent reported that he had been told that my mother had been seen wandering in front of Filenes at Downtown Crossing. Upon further examination, triggered by my questioning, it was revealed that David had misinterpreted information given to him by a coworker, Jose (Miguel) Guittierez. As I am sure that you are aware my mother was never seen by any member of your staff wandering around Downtown Crossing in need of assistance. I sent copies of my May 21, 2002 letter to both David Cross and Jose (Miguel) Guittierez as well as to Ms. Gavin, Mr. Perkins and your board of directors. Since that letter was sent, no one from Federal Management has disputed the accuracy of my account of the alleged Downtown Crossing incident. You certainly did not dispute its accuracy in your June 4, 2002 letter you sent to me. Its accuracy was not disputed by anyone at the June 13 meeting. Nor did you dispute its accuracy in your June 14, 2002 follow-up letter that you sent to me.

Therefore I assume that when Mr. Perkins states, as he did in his letter  "..... I along with several members of our staff have some serious concerns about your mother's safety"; what Mr. Perkins is now referring to are simply the observations by Ms. Gavin and him, and that there are no other parties from Federal Management with knowledge of "safety" issues on the part of my mother. I also assume that any and all "safety" issues were brought up at our June 13, 2002 meeting. In other words I can assume that there will be no other "forgotten" episodes, or "memory lapses", such as the one now being recalled by Ms. Gavin and her supposed encounter with my mother last year (time and date unknown.)

It should be noted that Ms Gavin's story is nearly identical to the now discredited Downtown Crossing allegation made earlier by staff of Federal Management. The only difference is the location where my mother was supposed to be lost. When David Cross first heard the story, it was Downtown Crossing. With Ms. Gavin's version, it's Tremont Street. There is however one crucial difference between these two stories. In the case of Ms. Gavin, she has a memory lapse of this event until many months later. However I was told about the Downtown Crossing incident on the very day when it was suppose to have happened. And because of the timeliness of this information I was able to question it's validity immediately. And the two people involved, David Cross and Jose (Miguel) Guittierez immediately corrected the story. But again that is because David Cross informed me immediately of this situation, probably because he really thought that my mother might have been in jeopardy. Just as Jose (Miguel) Guittierez corrected the story right away so that I would not have undue cause for concern. My mother had never been at risk on the city streets. As noted, no such assurance, validation or confirmation can be done with Ms. Gavin's story because she never told me about it.

Bette J Anderson ⟨Exhibit D 9⟩ July 3, 2002

### My response to this now complete list of safety issues brought up at our meeting

And so with the complete list of safety issues having been provided to me on June 13, I would like to address all of these remaining "safety" concerns that have been the basis for the extraordinary involvement of Federal Management in the movements and the affairs of my mother.

Mr. Perkins outlined three "safety" incidents of particular concern to him. They are a) that my mother constantly came by the management offices and needed assistance to get back to her apartment; b) that on one occasion my mother was inappropriately dressed when leaving her apartment and came into the lobby area of the Stearns; and c) my mother had bothered her neighbor by asking for food to eat.

### "Safety" issue A: My mother coming by the Stearns office; unable to find her way back to her apartment.

When this was brought up as an issue, I posed a question. Was there something wrong with any tenant who lives at the Stearns coming by the office, for whatever reason, to talk with any staff member if they wanted to. You told me that there was no problem with this. I asked why would this be a problem if my mother did the same. You stated that there would be no problem with her doing the same. I then asked, if a resident came by so frequently, that this person then became a distraction, wouldn't it have been appropriate for the staff member to inform the individual that the staff member was preoccupied at the time. You agreed. I then asked, couldn't any staff member just close their office door if they felt they needed more privacy. You also agreed. As I continued my conversation in this manner, you finally allowed that in fact there was no problem with my mother coming down to talk with any staff member or to talk with any of the security guards. As a resident she had every right to do so and could expect the same courtesy as that which would be extended to any other resident.

As for having to direct her back to her apartment, Mr. Perkins validated information first provided to you in my May 21, 2002 letter. In that letter I described how Mr. Perkins had followed my mother to her apartment one day after she left the eleventh floor office of Ms. Gavin. And when my mother, as is her custom, successfully found her way back to her own apartment, Mr. Perkins was overheard to have remarked that my mother could indeed find her own way back to her own apartment. (Of course this is something that my mother has been doing for over twenty one years since living at the Stearns.)

At this point you then stated the obvious. There was nothing wrong here, no problem, no safety issue. No reason for concern. Which leads me to ask the question: how could the issue of my mother coming to the office, or talking to the security guard, how could these normal events ever have been considered "safety" issues in the first place. That is the context in which it was described by Mr. Perkins (and earlier by Ms. Gavin). However there was no possible issue of safety here at all. And no possible reason for concern.

Bette J Anderson  July 3, 2002

### "Safety" issue B. My mother annoying one of her neighbors for food.

When this was brought up by Mr. Perkins it was put in the context that my mother might not have enough food to eat, and that she was becoming a problem for her neighbors by asking for food. I asked how many neighbors Mr. Perkins was referring to. It turned out that it was just one neighbor. I made a comment at the time that my mother, like so many elderly who are on fixed income, participates in the "meals on wheels" program. I also knew that my mother sometimes does not care for the selection of the day and prefers to eat something else. Perhaps this could be the reason she asked a neighbor for food. However I wanted to find out for myself the accuracy of the statement by Mr. Perkins, that my mother was annoying a neighbor for food. Since that meeting I have talked at length with the neighbor in question. And like so many other "concerns" raised by members of your staff, there is much more to the story than what was originally put forth during our meeting.

I have known the neighbor in question for many years. She is someone who has been living at the Stearns for as long as my mother has, some twenty one years. She told me that my mother and she had been pretty close for a number of years early on. And for many of those years this neighbor would bring home cakes, pastries, or baked foods, which sometimes turned out to be much more than she needed. This neighbor said that she delighted in sharing these food items with several of her friends, my mother being one. In fact for many years this neighbor would walk unannounced into my mother's apartment and bring her assorted food items along with the neighbor's copy of the days newspaper. I was there on several of these occasions. This arrangement had been going on long before Federal Management came aboard, and long before Ms. Gavin started working at the Stearns.

Recently the neighbor stopped bringing food or the newspaper to my mother, which of course is her privilege. In fact these two ladies are no longer as close as they had been, particularly now that they both have gotten much older, a fact that the neighbor freely acknowledges. Could my mother have asked this neighbor for something to eat at one time or other. Possibly. I don't know. The point here is that it would not have been unusual if this had happened since it had been such a normal practice in the past. But the real outrage is how your staff, once becoming aware of this situation, has tried to build it into something more ominous, something that has been twisted to mean much more that it actually does. And like everything else that has to do with this management team and it's obsession with the daily habits and routines of my mother, this discussion or disagreement or apparent slight between two elderly neighbors now gets elevated to a "concern" and/or a possible "safety" issue. To me it's unbelievable that this issue could somehow be considered one of the three major issues being brought up by Mr. Perkins. This is apparently the sort of issue that Mr. Perkins felt important enough to write me a letter about on February 1, 2002. The type of issue that needed the attention of my mother's entire family. On one level, quite simply astounding. On another level, simply outrageous!

Bette J Anderson  July 3, 2002

## Safety" issue C: The Stearns Dress Code

The final "safety" issue brought up by Mr. Perkins was this; his concern that my mother was not dressed appropriately on one occasion when she came to the downstairs lobby. Of all the "safety" issues that were brought up, this particular incident is the most troubling. Mr. Perkins stated that on one occasion my mother came to the lobby and was "inappropriately" dressed. He stated that she was dressed in a housecoat of some sort. He then went on to add that in his mind <u>he wasn't sure exactly what, if anything, my mother had on underneath her housecoat.</u> (This was a disparaging, sexist and completely demeaning remark, one which says a lot about the mindset of a person who would utter such a statement.) How extraordinary that a senior member of your staff would make such a comment. I can only guess what it was that Mr. Perkins was trying to infer. Perhaps he was trying to suggest that my mother was not capable of dressing herself appropriately. Which is the most charitable way I can characterize Mr. Perkins' inferences.

Instead all that Mr. Perkins proved to me was the level of his frustration, with his inability to establish any sort of rationale, any sort of intelligent and logical basis for all the concerns that he and Ms. Gavin had been suggesting for months. This lack of specificity, lack of documentation, and an increasing lack of credibility was becoming more and more apparent to me as the meeting continued. Mr. Perkins concluded by allowing that he would have a real problem with anyone who was dressed as "inappropriately" as my mother was, coming into the lobby.

So now we need to address this issue of a tenant being "appropriately" dressed. Consider that the mailboxes for all of the Stearns' residents are located in front of the elevators in the interior lobby of the building. Could tenants come down in their housecoats to get their mail, or is this forbidden by Federal Management? Mr. Perkins stated that he would have a real problem with someone who was "inappropriately" dressed while in the lobby. I assume this would mean being appropriately attired when coming down to pick up their mail. Well "appropriateness" needs to be clearly defined. Federal Management would need to devise and enforce a dress code, day and night. And of course this dress code would have to apply to all residents of the Stearns and not just to my mother. Such a dress code would allow everyone to know in advance what Mr. Perkins feels is permissible, and what he deems impermissible (assuming of course that such a dress code could withstand a legal challenge.) At any rate I am unaware of any such dress code. But what I am sure of is this: neither I nor any other member of my mother's family has ever seen my mother "inappropriately" dressed. <u>Ever</u>. This condescending attitude by Mr. Perkins is just another example of a member of your staff who is obsessed in proving that my mother doesn't belong at the Stearns, trying to create a situation, or concern, where none existed before.

This "dress code" was put forward as the third "safety" issue that was deemed such a concern by Mr. Perkins and Ms. Gavin. One of the issues that they felt justified the extraordinary measures they had taken to monitor my mother's movements, to write letters demanding immediate meetings of family members, and to issue threats to my mother's tenancy.

Bette J Anderson                    Exhibit 012                    July 3, 2002

## A summation of the June 13 meeting

Ms. Anderson, what I saw and heard at this meeting were two individuals struggling mightily to come up with any real justification for their actions. Ms. Gavin talked for almost fifteen minutes, and when she finished, the only "safety" concern she offered was meeting my mother one day last year when, according to her statement, she had to help my mother find her way back home. Ms. Gavin can't tell us the time of day, or the day of the week, or the month in which this is supposed to have occurred. On top of that Ms. Gavin never mentions this incident for months, never mentions it in her January 7, 2002 letter to me - a letter where she reports in some detail a rather innocuous incident where a neighbor redirects my mother to her apartment. But now, suddenly, and rather conveniently, this incident all comes back to her.

Mr. Perkins sends me a letter, asking for my "prompt attention to this important matter." He requests a meeting of family members because "several members of our staff have some serious concerns about my mother's safety." Serious concerns, mind you. And just what are these serious concerns that he finally detailed in our meeting? They consisted of my mother coming to the office, or talking to the security guards too often; my mother asking a neighbor for food; and my mother being inappropriately dressed - inappropriate according to Mr. Perkins' standards - when she came into the lobby of the Stearns. And so there it is. Three "concerns" for my mother's safety. And a chance encounter on the street.

What I also find very interesting is that in your June 14 follow-up letter you failed to mention any of these particulars which constituted nearly all of our conversation at the meeting. You mentioned nothing about food, nothing about inappropriate dress, nothing about Ms. Gavin's past memory lapses (now fully restored.) Nor did you mention anything about my strong challenges to the statements of Ms. Gavin, or the emotional disagreement that ensued between the two of us. You elected to leave all of this out which is rather curious since, as I have stated, these were the essential elements of our meeting.

Now the focus of your concern has noticeably shifted. Instead, in your June 14th letter you now state that the actions of your staff were really out of fear that harm was going to come to my mother because of her "disorientation."

## The "disorientation" which you referenced in your letter

In your June 14 letter you wrote that this "disorientation" was witnessed at various times by Ms. Gavin and Mr. Perkins Please consider the fact that my mother is at an advanced age; she is eighty six years old. Also her doctors have at various times prescribed different medications which can produce side effects. However neither her age, nor the effects of the medications has ever put my mother in jeopardy of harm. And I must add that no member of your staff is a qualified medical physician. What is important is this. With the help of the support services that I arranged for my mother over many years, and the constant love and support of members of her family, my mother has been able to live safely, securely and independently at the Stearns. More to the point. There was no question of this until Federal Management arrived.

I think that this new emphasis on "disorientation" is really an admission on your part that the "safety" issues offered by Mr. Perkins and Ms. Gavin added up to nothing more than unwarranted and unjustified interference into my mother's life. And the threats to my mother's tenancy were nothing more that a pretext for intimidation. So now your focus is to be on "disorientation" and a fear that my mother is going to come to some harm. I don't agree, and more importantly the facts don't support it. Regardless of this new emphasis, however, the actions of your staff over the last six months have been unwarranted and totally inexcusable.

## Conclusions

What is now apparent to me is that Ms. Gavin, Mr. Perkins and you have failed to demonstrate any serious safety concerns relative to my mother's tenancy at the Stearns. The issues brought up at the meeting absolutely did not warrant the level of seriousness that was depicted in the letters sent by Ms. Gavin, Mr. Perkins or by you, despite how hard your staff tried to "spin" the facts during our meeting. And I am still not convinced that these issues were not, at their core, an attempt to create false documentation and then a paper trail in order to justify a threat to my mother's tenancy, your written protestations (June 4 letter) to the contrary. If Mr. Perkins wasn't attempting to create some sort of paper trail, why did he close his February 1, 2002 letter with the following statement:

> "cc: Tenant record of Mary Lou Moore, Apt 1013".

Protestations aside, I think the actions of your staff are quite apparent. They were done first to falsely create, and then to document a record of non compliance, designed undoubtedly for some future use against my mother. To suggest otherwise is to deny the obvious.

What will be much harder for Federal Management to deny is this: The case against my mother was undertaken within five weeks after Federal Management took over the Stearns. When Ms. Gavin wrote her letter, threatening my mother's tenancy, it was sent on January 7, 2002. When Mr. Perkins wrote that he, along with other members of his staff had some serious concerns about my mother's safety, he wrote that letter on February 1, 2002. As you well know, Federal Management took over control of the Stearns on December 21, 2001

Finally consider the amount of time between Mr. Perkins letter of February 1, 2002 and the time of our meeting - June 13, 2002. That's a total of nineteen weeks, more than three months between those two dates. That was certainly more than enough time for Mr. Perkins to either have his concerns about my mother validated. Or upon finding insufficient support for his views, ample time to question his original judgments. During these nineteen weeks was he able to bolster his case with specific facts? Not at all. (As evidenced by his lack of credible supporting documentation at the June 13 meeting.) And failing to find any facts to support his views, was he willing to admit that he was wrong? Again the answer is the same. No! In my mind he continues to believe that my mother is unfit to live at the Stearns. It was not until our meeting on June 13 where he was compelled to state, for the record, the rationale for his

Exhibit D14

actions. A rationale that now apparently has been jettisoned, and replaced with a concern for my mother's safety based on her apparent "disorientation."

You have failed to show that the behavior of your staff towards my mother was based on any real "safety" concerns. And the occasional "disorientation" to which you now refer certainly did not warrant, nor does it justify the extraordinary measures imposed on her by your management team.

Ms. Andersen, you are the President of Federal Management and as its most senior corporate officer you are completely responsible for the actions of your employees, whether you were fully aware of these actions or not. However it turns out that you were in fact very much aware of their actions. You wrote in your June 4, 2002 letter that you had some prior knowledge of what Mr. Perkins and Ms. Gavin were attempting to do with regards to my mother. In your letter you wrote the following:

> "I have just returned from vacation and read your letter regarding your
> mother's situation. I was somewhat aware of the problems because of previous
> discussions I had had with Mary Gavin and Allen Perkins."

Just how much you may have been aware - somewhat aware; completely aware - is really academic given your leadership position at Federal Management. The fact is; you were aware. What concerns me is what actions you took, or didn't take, when I advised you in my May 21, 2002 letter of the serious problems my mother had encountered since your company took over the Stearns. Mr. Perkins may not have believed there was any reason to question his decisions during those nineteen weeks. However you certainly had the opportunity to fully assess the correctness of his decisions, and that of Ms. Gavin, between the time that you received my letter and the time of our meeting. I think it is reasonable to assume that in your capacity as President, you completely familiarized yourself with all of the particulars that had to do with my mother by the time of our meeting. And whereas June 13 marked the first time I heard the complete stories from Ms. Gavin and Mr. Perkins, you had ample opportunity to have heard from the two of them before the date of our meeting. As such it is hard for me to imagine that you could not have understood and appreciated the serious holes in their stories, something any responsible individual could easily have seen. And yet your response was to believe and support Mr. Perkins and Ms. Gavin during that meeting, finding that their actions on behalf of Federal Management were completely justified.

### No more reported incidences since my May 21 letter

Since I sent you and your staff my May 21, 2002 letter challenging the allegations brought by Mr. Perkins and Ms. Gavin, there have been no more reported incidents of any kind. Is this just a coincidence. I don't think so. In my letter I was vary specific with the level of detail that I provided, a level of detail that was missing in the reports offered by Ms. Gavin and Mr. Perkins. You will recall that at the June 13 meeting I pointedly asked Mr. Perkins if he had noticed any problems or had any concerns with my mother recently. He answered that he had

Exhibit D 15

not seen my mother at all in the previous three or four weeks. That three or four week period of time coincides with the mailing of my May 21, 2002 letter. Frankly it doesn't surprise me that the allegations of mishaps supposedly committed by my mother have suddenly become inoperable. No more alleged wanderings. No verifiable safety violations. Everything now has been replaced with the concern for my mother's safety because of her "disorientation.".

### Protective Services/Elders at Risk Agency

With the information you provided that the Elders at Risk agency is responsible for having my mother taken to the hospital on April 22, 2002, I will follow this up to find out how it came to be that my mother was violated in this manner, and who at their agency was responsible for this unwarranted assault on her physical and mental health.

### The reason my mother did not attend the June 13, 2002 meeting

You made reference in your letter to the fact that my mother did not attend the June 13 meeting. You termed it unfortunate. I disagree. I made the decision that she would not attend because I assumed the meeting might become emotional and testy. I was right. During the first half of the meeting Ms. Gavin and I squared off as she recounted her knowledge of events. As I have already written, you had to interrupt her on a couple of occasions to get the emotional level restrained. My conversation with Mr. Perkins, Ms. Bronk and with you was conducted professionally and in a more measured and reasonable tone. Nevertheless my elderly mother did not need to be subjected to such a provocative process, with demeaning comments about her "inappropriate" dress habits. She has been a model tenant for more than twenty one years even though she now finds herself to be at the center of these painful events, albeit through no fault of her own. These unjustified actions which have caused her considerable harm.

For these reasons I will continue to be the point person, now and in the future. This will help to insure that no further emotional distress is bestowed upon my mother. My mother, at age eighty six, would certainly have become frightened and overwhelmed in the sort of meeting that was conducted on June 13. On the other hand I have no such fear. And as her son I can, and will, represent my mother's interest very capably. And as I have already shown, I will take all the time necessary to get to the bottom of each and every issue. I will take the time to get to the truth.

### Providing false and deceptive information to outside individuals and outside agencies

At the beginning of the meeting I voiced my objections to your having invited, without my knowledge, an employee from an outside social service organization, one that provides my mother with some of her services. This individual should never have been invited to this meeting. It was unprofessional for you to have done so without consulting me. Furthermore considering the confidentiality of tenant information that every tenant has a right to expect, your invitation to this person was highly unethical as well. It was left to me to insist that this individual leave. By my having to make this request, a negative impression may have been

Exhibit D 16

created concerning my mother. I strongly resent being forced into this position by your actions which may have compromised my mother's relationship with one of her providers.

Nevertheless your invitation to an individual outside of Federal Management serves to underscore a major objection to how your staff has dealt with my mother, her affairs and her reputation. Federal Management has provided information about my mother to others outside of Federal Management. With little or no regard to my mother's privacy, your staff has provided information to individuals outside of the rental office including other tenants, as well as individuals in outside organizations. Much of this information has been the dubious and suspect charges of Ms. Gavin and Mr. Perkins, including the aforementioned safety issues and concerns reviewed earlier in this letter. This information has been shown to be totally without merit and completely biased in order to place my mother and her affairs in a negative light.

In addition member(s) of your staff may have improperly ascertained privileged and personal information, including confidential medical information, from individuals, and/or from outside medical and social service providers.

This intrusion by Federal Management into my mother's affairs has caused not only significant harm to my mother's once stellar reputation, but the negative and biased information provided by Federal Management has been the catalyst for adverse rulings from outside organizations that has further caused my mother enormous pain, suffering and emotional distress.

> **Federal Management had no right to seek out privileged information, concerning my mother, from others.**

> **Federal Management had no right to acquire privileged information, concerning my mother, from others.**

> **Federal Management had no right to disseminate false, deceptive and misleading information that Federal Management knew, or should have known, would cause great harm to my mother and my mother's reputation.**

> **Federal Management had no right to disseminate privileged and confidential information about my mother, to any outside parties.**

### Request to monitor my mother in the future

At the close of our meeting you asked if your staff should continue to keep an eye on my mother in the future, especially late in the afternoon. My answer now is the same as it was then. You are to treat my mother in the same manner as you treat every other tenant. And that means you are not to keep any record of her comings and goings, nor any of her other activities, unless you are doing the same for every tenant in your facility, in which case advance notice should be provided to them, as well as to my mother.

Page 16 of 17

Bette J Anderson    Exhibit D17    July 3, 2002

I am particularly concerned about your decision, as outlined in your letter, to call me with any problems that you may notice with my mother in the future. This is a particular concern especially if this could be used as a pretext for continuing to monitor my mother's movements and activities. Let me emphasize again that any monitoring of my mother's movements and activities would be totally unacceptable. Treat my mother as you would every other tenant in the building, consistent of course with your legal responsibilities and within all the laws of the Commonwealth. For our part my sister and I will check in from time to time with Mr. Perkins or your security staff to inquire about any events of a serious nature that involve my mother.

### The Bottom Line

The conclusions I have arrived at are pretty clear. Your decision to put my mother under a microscope because of some supposed concern for her safety was totally unwarranted and unjustified. Your company has engaged in a pattern of harassment of my mother going back almost since the date of your arrival. My mother's treatment these last six months stands in stark contrast to her treatment during the previous one years by other management teams at the Stearns. And no amount of debate, disagreement and/or challenge to these facts will alter that fundamental fact at all. Simply stated, my mother's life was that of an ordinary elderly resident before Federal Management became involved. And since your arrival, my mother's quality of life and her health, both physically and mentally, has been seriously and negatively impacted. Her stellar reputation among other residents and staff, including professionals at other social service agencies has been compromised and demeaned by vicious rumors, as well as erroneous allegations of serious safety issues that your staff has alleged as truthful. In addition, all of this has caused me to personally have to spend hundreds of hours over many weeks to ascertain and document the truth about my mother's treatment by members of your staff. And yet it is still not over. As of this date I am still working to correct the false information that has been provided to other individuals and agencies by Federal Management. The harm that your staff has caused my mother has been very, very substantial.

Sincerely

Christopher A Moore; son of Mary Lou Moore

cc    Gilliam Gatte:         Clerk and Treasurer
      Richard Henken:        Director
      Stephen N. Wilchins:   Director
      Donna Bronk, Allen Perkins, Mary Gavin, David Cross; Jose (Miguel) Guittierez
      Members of the Moore Family

Enclosures:    Mary Gavin January 7, 2002 letter to Chris Moore
               Allen Perkins February 1, 2002 letter to Chris Moore





February 13, 2003

Mr. Christopher Moore
141 Intervale Street
Boston, Massachusetts
02121

Re: Mary Lou Moore

Dear Mr. Moore:

Your letter dated February 10, 2003 requesting an investigation into your mothers past residency at The Stearns, has been forwarded to the undersigned for an initial response.

We will commence an immediate investigation into the allegations you have raised. At this time I am unable to give you a definitive date as to when the investigation may be concluded.

As soon as it is concluded we will provide you with a written response.

Sincerely,

Stuart Hartman
Vice President of Operations

911 N. Studebaker Road, Long Beach, CA 90815-4900 · (562) 257-5100 · Fax (562) 257-5200
Member, Council for Health and Human Services Ministries, United Church of Christ
www.rhf.org · TDD (800) 545-1833 EXT. 359 · email: info@rhf.org



**Foundation Property Management, Inc.**
A Retirement Housing Foundation® Affiliate

*Exhibit F1*

April 7, 2003

Mr. Cliff Moore
141 Intervale Street
Boston, Massachusetts 02121

**Re:    Mary Lou Moore**

Dear Mr. Moore:

We are writing in response to your letter, dated February 10, 2003, alleging misconduct by the management staff of the Stearns Building at 10 Temple Place in Boston. Please be advised that we are attempting to conclude our investigation. As such, we would like an opportunity to speak with you by telephone to see if you have any additional information to provide.

We thoroughly reviewed the documentation you previously submitted, however, you did not provide us with your telephone number. We have attempted to obtain your number through directory assistance, who informed us that it is an unlisted number. In the event that you choose to participate in the remainder of the investigation, we would greatly appreciate your providing us with a telephone number where you can be reached during daytime hours. You can contact me at (562) 257-5109. Since I may be traveling, please feel free to leave a voice mail message and I will be pleased to return the call.

In the event that we do not receive your telephone number, we will conclude our investigation without the benefit of your statement.

Sincerely,

Stuart Hartman
Vice President of Operations

cc:    Robert Amberg
       Laverne R. Joseph

911 N. Studebaker Road, Long Beach, CA 90815-4900 · (562) 257-5100 · FAX (562) 257-5200
Member, Council for Health and Human Service Ministries, United Church of Christ
www.rhf.org · TDD (800) 545-1833 EXT. 359 · email: Info@rhf.org




*Exhibit G1*

# FAX

| | |
|---|---|
| To: | *Stuart Hartman* |
| From: | *Christopher Moore* |
| Copy | *Board of Directors* |
| Fax: | *562 257-5200* |
| Date: | *April 11, 2003* |
| Subject: | *Mary Lou Moore* |
| Pages | 1 including cover page |

Mr. Hartman

I have received your letter dated April 7, 2003. For some reason you have addressed the letter to Cliff Moore instead of Christopher Moore. This is odd since your original letter to me, dated February 13, 2003, had my name spelled correctly.

The assumption that I have been working on since April 1, 2003 is that your organization, the Retirement Housing Foundation has not been serious about investigating the physical and emotional assaults of my mother by the members of your management team last year. I believe that this seven week period of time (February 10, 2003 - April 1, 2003) with no further communication from you indicates either a lack of interest, or a lack of seriousness in investigating what happened to my mother, why it happened, and who was involved. Now I receive a letter on April 10, 2003 essentially stating that you are continuing to investigate. This confirms my assumptions.

I sent you and members of your board an eighty eight page factual report. I believe you had quite a substantial amount of detail with which to begin and conclude your investigation by now.

Exhibit H1

May 30, 2003

Board of Directors
TO:    Rev. Dr. John E. Trnka, Chairperson
       Rev. Dr. Teruo Kawata
       Dr. William E.Rader
       Ray East
       Dr. Darryl M. Sexton
       Tom S. Masuda, Treasurer
       Nancy McPeak
       Jean Moore Warrick
       Rev. Dr. Laverne R. Joseph, President & CEO
       Christina Potter
       Stewart M. Simington
       Donald W. King, Vice Chairperson.
Retirement Housing Foundation
911 North Studebaker Road
Long Beach, CA 90815-4900

To the above list:

On February 10, 2003 I sent each Director a copy of an eighty eight page report detailing the
assaults and abuse committed against my mother, Mary Lou Moore by agents working on behalf of
the Retirement Housing Foundation and its affiliated organizations. I demanded that the Board of
Directors conduct an immediate investigation into all of the factors and circumstances surrounding
these assaults. In response your Vice President of Operations, Stuart Hartman, acting on behalf of
the Board has sent me three letters. The first, dated February 13, 2003 acknowledged receipt of my
material and promised an immediate investigation.

*"We will commence an immediate investigation into the allegations that you have raised.
At this time I am unable to give you a definitive date as to when the investigation may be
concluded. As soon as it is concluded we will provide yo with a written response."*

Nearly two months later Mr. Hartman sent another letter. In it he acknowledged that your
organization had thoroughly reviewed my lengthy eighty-eight page report. Mr. Hartman offered
me the opportunity to speak with him directly by telephone to see if I had any additional
information to provide. He requested that I provide him with my telephone number. He concluded
his letter by stating that if he did not receive my telephone number, the investigation would be
concluded without benefit of any additional statements from me.

*"We are writing in response to your letter, dated February 10, 2003, alleging misconduct
by the management staff of the Stearns Building at 10 Temple Place in Boston. Please be
advised that we are attempting to conclude our investigation. As such, we would like an
opportunity to speak with you by telephone to see if you have any additional information
to provide.*

Page 1 of 4

Bette J Anderson                  Exhibit D17                  July 3, 2002

I am particularly concerned about your decision, as outlined in your letter, to call me with any problems that you may notice with my mother in the future. This is a particular concern especially if this could be used as a pretext for continuing to monitor my mother's movements and activities. Let me emphasize again that any monitoring of my mother's movements and activities would be totally unacceptable. Treat my mother as you would every other tenant in the building, consistent of course with your legal responsibilities and within all the laws of the Commonwealth. For our part my sister and I will check in from time to time with Mr. Perkins or your security staff to inquire about any events of a serious nature that involve my mother.

### The Bottom Line

The conclusions I have arrived at are pretty clear. Your decision to put my mother under a microscope because of some supposed concern for her safety was totally unwarranted and unjustified. Your company has engaged in a pattern of harassment of my mother going back almost since the date of your arrival. My mother's treatment these last six months stands in stark contrast to her treatment during the previous twenty one years by other management teams at the Stearns. And no amount of debate, disagreement and/or challenge to these facts will alter that fundamental fact at all. Simply stated, my mother's life was that of an ordinary elderly resident before Federal Management became involved. And since your arrival, my mother's quality of life and her health, both physically and mentally, has been seriously and negatively impacted. Her stellar reputation among other residents and staff, including professionals at other social service agencies has been compromised and demeaned by vicious rumors, as well as erroneous allegations of serious safety issues that your staff has alleged as truthful. In addition, all of this has caused me to personally have to spend hundreds of hours over many weeks to ascertain and document the truth about my mother's treatment by members of your staff. And yet it is still not over. As of this date I am still working to correct the false information that has been provided to other individuals and agencies by Federal Management. The harm that your staff has caused my mother has been very, very substantial.

Sincerely

Christopher A Moore; son of Mary Lou Moore

cc      Gilliam Gatte:        Clerk and Treasurer
        Richard Henken:       Director
        Stephen N. Wilchins:  Director
        Donna Bronk, Allen Perkins, Mary Gavin, David Cross; Jose (Miguel) Guittierez
        Members of the Moore Family

Enclosures:   Mary Gavin January 7, 2002 letter to Chris Moore
              Allen Perkins February 1, 2002 letter to Chris Moore



**Retirement
Housing
Foundation®**

*Exhibit E 1*

February 13, 2003

Mr. Christopher Moore
141 Intervale Street
Boston, Massachusetts
02121

Re: Mary Lou Moore

Dear Mr. Moore:

Your letter dated February 10, 2003 requesting an investigation into your mothers past residency at The Stearns, has been forwarded to the undersigned for an initial response.

We will commence an immediate investigation into the allegations you have raised. At this time I am unable to give you a definitive date as to when the investigation may be concluded.

As soon as it is concluded we will provide you with a written response.

Sincerely,

Stuart Hartman
Vice President of Operations

911 N. Studebaker Road, Long Beach, CA 90815-4900 · (562) 257-5100 · Fax (562) 257-5200
Member, Council for Health and Human Services Ministries, United Church of Christ
www.rhf.org · TDD (800) 545-1833 EXT. 359 · email: info@rhf.org





**Foundation Property
Management, Inc.**
A Retirement Housing Foundation® Affiliate

*Exhibit F 1*

April 7, 2003

Mr. Cliff Moore
141 Intervale Street
Boston, Massachusetts 02121

**Re:    Mary Lou Moore**

Dear Mr. Moore:

We are writing in response to your letter, dated February 10, 2003, alleging misconduct by the management staff of the Stearns Building at 10 Temple Place in Boston. Please be advised that we are attempting to conclude our investigation. As such, we would like an opportunity to speak with you by telephone to see if you have any additional information to provide.

We thoroughly reviewed the documentation you previously submitted, however, you did not provide us with your telephone number. We have attempted to obtain your number through directory assistance, who informed us that it is an unlisted number. In the event that you choose to participate in the remainder of the investigation, we would greatly appreciate your providing us with a telephone number where you can be reached during daytime hours. You can contact me at (562) 257-5109. Since I may be traveling, please feel free to leave a voice mail message and I will be pleased to return the call.

In the event that we do not receive your telephone number, we will conclude our investigation without the benefit of your statement.

Sincerely,

Stuart Hartman
Vice President of Operations

cc:    Robert Amberg
       Laverne R. Joseph

911 N. Studebaker Road, Long Beach, CA 90815-4900 · (562) 257-5100 · FAX (562) 257-5200
Member, Council for Health and Human Service Ministries, United Church of Christ
www.rhf.org · TDD (800) 545-1833 EXT. 359 · email: info@rhf.org




*Exhibit G1*

# *FAX*

**To:**       *Stuart Hartman*
**From:**     *Christopher Moore*
**Copy**      *Board of Directors*
**Fax:**      *562 257-5200*
**Date:**     *April 11, 2003*
**Subject:**  *Mary Lou Moore*
**Pages**  1 including cover page

Mr. Hartman

I have received your letter dated April 7, 2003. For some reason you have addressed the letter to Cliff Moore instead of Christopher Moore. This is odd since your original letter to me, dated February 13, 2003, had my name spelled correctly.

The assumption that I have been working on since April 1, 2003 is that your organization, the Retirement Housing Foundation has not been serious about investigating the physical and emotional assaults of my mother by the members of your management team last year. I believe that this seven week period of time (February 10, 2003 - April 1, 2003) with no further communication from you indicates either a lack of interest, or a lack of seriousness in investigating what happened to my mother, why it happened, and who was involved. Now I receive a letter on April 10, 2003 essentially stating that you are continuing to investigate. This confirms my assumptions.

I sent you and members of your board an eighty eight page factual report. I believe you had quite a substantial amount of detail with which to begin and conclude your investigation by now.

*Exhibit H1*

May 30, 2003

Board of Directors
TO:    Rev. Dr. John E. Trnka, Chairperson
       Rev. Dr. Teruo Kawata
       Dr. William E.Rader
       Ray East
       Dr. Darryl M. Sexton
       Tom S. Masuda, Treasurer
       Nancy McPeak
       Jean Moore Warrick
       Rev. Dr. Laverne R. Joseph, President & CEO
       Christina Potter
       Stewart M. Simington
       Donald W. King, Vice Chairperson.
Retirement Housing Foundation
911 North Studebaker Road
Long Beach, CA 90815-4900

To the above list:

On February 10, 2003 I sent each Director a copy of an eighty eight page report detailing the assaults and abuse committed against my mother, Mary Lou Moore by agents working on behalf of the Retirement Housing Foundation and its affiliated organizations. I demanded that the Board of Directors conduct an immediate investigation into all of the factors and circumstances surrounding these assaults. In response your Vice President of Operations, Stuart Hartman, acting on behalf of the Board has sent me three letters. The first, dated February 13, 2003 acknowledged receipt of my material and promised an immediate investigation.

> *"We will commence an immediate investigation into the allegations that you have raised. At this time I am unable to give you a definitive date as to when the investigation may be concluded. As soon as it is concluded we will provide yo with a written response."*

Nearly two months later Mr. Hartman sent another letter. In it he acknowledged that your organization had thoroughly reviewed my lengthy eighty-eight page report. Mr. Hartman offered me the opportunity to speak with him directly by telephone to see if I had any additional information to provide. He requested that I provide him with my telephone number. He concluded his letter by stating that if he did not receive my telephone number, the investigation would be concluded without benefit of any additional statements from me.

> *"We are writing in response to your letter, dated February 10, 2003, alleging misconduct by the management staff of the Stearns Building at 10 Temple Place in Boston. Please be advised that we are attempting to conclude our investigation. As such, we would like an opportunity to speak with you by telephone to see if you have any additional information to provide.*

Board of Directors RHF

Exhibit HG

May 30, 2003

*We thoroughly reviewed the documentation you previously submitted, however you did not provide us with your telephone number. We have attempted to obtain your number through directory assistance, who informed us that it is an unlisted number. In the event that you choose to participate in the remainder of the investigation, we would greatly appreciate your providing us with a telephone number where you can be reached during the daytime hours. You can contact me at (562) 257-5109. Since I may be traveling, please feel free to leave a voice mail message and I will be pleased to return the call.*

*In the event that we do not receive your telephone number, we will conclude our investigation without the benefit of your statement."*

In response to Mr. Hartman's second letter, I sent a letter in response on April 11, 2003. In that letter I express my frustration that after waiting for more than seven weeks, the promised investigation by your organization had not been concluded. Here is what I wrote.

*"The assumption that I have been working on since April 1, 2003 is that your organization, the Retirement Housing Foundation has not been serious about investigating the physical and emotional assaults of my mother by the members of your management team last year. I believe that this seven week period of time (February 10, 2003 - April 1, 2003) with no further communication from you indicates either a lack of interest, or a lack of seriousness in investigating what happened to my mother, why it happened, and who was involved. Now I receive a letter on April 10, 2003 essentially stating that you are continuing to investigate. This confirms my assumptions.*

*I sent you and members of your board an eighty eight page factual report. I believe you had quite a substantial amount of detail with which to begin and conclude your investigation by now."*

At the time that I wrote that letter I found it simply hard to understand the delay in concluding your investigation. Simply put, either your rental agents at the Stearns committed these acts of assault and abuse against my mother on April 22, 2003. Or they did not. If they did then the obvious question would be, why? And if they did not, then I would have expected that your organization would have immediately issued a statement disavowing the allegations in my report and would have quickly wrapped up your investigation. End of story.

Instead Mr. Hartman responded with his third letter, this one three weeks later on April 30, 2003. Here is what was stated:

*"This will acknowledge receipt of your letter of April 11, 2003. I apologize for not identifying your first name correctly.*

*As stated in my letter, I was hoping to discuss the investigation with you by telephone. Since you have not responded affirmatively, we will be concluding our investigation without the benefit of our discussions.*

Page 2 of 4

*Please be further advised that despite your assumptions, this investigation has been and is being conducted fairly."*

I then responded to this letter with another letter on May 7, 2003 in which I took issue with Mr. Hartman's statement that I had not responded affirmatively to his request to call his office. I also detailed my unease with conducting any investigation by telephone. Here is part of that letter.

*"I have received your letter dated April 30, 2003. In your letter you elected to omit certain information and as such the letter is misleading. The fact is that I made three telephone calls to your office last week. On two of those occasions I left a message on your voice mail and identified myself. On the third occasion I talked directly to your secretary, again identifying myself. She told me that you are constantly in and out of your office and she could not give me a specific time when she knew that you would be in your office. In fact I also called the preceding week but on that occasion I did not leave my name as I had the three times I called last week. Therefore your statement that I "have not responded affirmatively" to your request to call your office is false.*

*As I stated in my fax on April 11, 2003 I have already provided you with quite a substantial amount of documentation in my original report, eighty eight written pages. But there is another very important consideration that should be addressed about communicating over the telephone. I have very real concerns about the possibility for misinformation or misinterpretation which can happen with any verbal communication. Hypothetically, at some future time, references could be made to discussions that supposedly took place during any such verbal communications, discussions that in fact may not have occurred at all but would be difficult to refute.*

*I again refer to your April 30, 2003 letter where you elected not to accurately state the facts. The facts are that I attempted but was unable to reach you on at least three separate occasions last week. Again, the fact that you elected to omit this information is not a good sign about the intent, purpose and scope of your still continuing investigation. I responded "affirmatively" to your request to call you office."*

My letter continued with four additional pages of information that I thought might be helpful to your investigation. This additional information was provided to your organization in writing, not via voice communication so there can be no question, now or in the future, as to what was being communicated. And with that letter having been sent, I had provided you with all the information that I could that would have been essential and would have been helpful to your investigation. And frankly the wealth and breadth of the information that I had earlier provided your organization was in fact much more than necessary for you to begin and conclude your investigation. Not only have I provided you with details of what happened, I backed it up with actual documentation. You have had everything necessary to concluded your investigation.

June 9, 2003 will represent four months since I first demanded that you conduct an investigation into what happened to my mother since your agency took ownership of the apartment building that she had lived in for over twenty years. My mother is an eighty seven year old elderly black lady. Until your agents took control of the Stearns apartment building she was just an ordinary widow

Board of Directors RHF                                                May 30, 2003

living modestly on her social security. Since your arrival she has been physically and emotionally assaulted and abused terribly. An incredible series of assaults were deliberately committed against her and were orchestrated by people in your employ. I demand to know why.

June 9, 2003 will also represent two months since you have acknowledged thoroughly reviewing my documentation. The people involved in these events are under your direct control. They work for you, at your pleasure, therefore you have access to all the details of what went on. You are the owners of the building. There has been ample time to have concluded with your investigation.

On June 9, 2003 I will begin to send out reports to individuals and agencies to make them aware of the viscous assaults against my mother, and the role agents working on your behalf have had in the attempt to destroy the final years of this woman's once extraordinary life. I will make them aware of the brutal assaults on her civil rights and the elder abuse that she has suffered since your organization has entered into her life. I will also make it clear that after four long months, your board has failed to provide me with an accounting of why these events happened to my mother.

As a Board you have a fiduciary responsibility to see that everyone in your organization and everyone under your control follows the rules and laws enacted on the federal and state level on behalf of your constituents. You also have an ethical and moral duty to insure the safety and well being of the vulnerable elderly people who reside in your communities. Your organization has failed to do so on all accounts. Your organization has been indifferent to finding out the truth. .

Not withstanding the issuance of my reports to various parties, I am going to continue to lobby with as many people as I can who may have special influence with your organization in order to ascertain the full and complete story of what happened to my mother, and why.

Sincerely,

Christopher Moore
Son and caretaker of Mary Lou Moore

Cc    Robert Amberg
      Stuart Hartman
      BDO Seidman, LLP

Exhibit 11

**Foundation Property**
**Management, Inc.**
A Retirement Housing Foundation' Affiliate

June 9, 2003
Via FedEx 7916 0874 3139 Std

Mr. Christopher Moore
141 Intervale Street
Boston, Massachusetts 02121

Re: Mary Lou Moore / The Stearns

Dear Mr. Moore:

This will acknowledge receipt of your letter dated May 30, 2003, addressed to the Board of Directors and certain other officials of Retirement Housing Foundation ("RHF"). This will also serve as notice to you that our investigation into the matters raised by your initial correspondence to us of February 10, 2003 is now concluded.

When your initial correspondence arrived, the RHF Board of Directors authorized me to investigate the matters raised in your letter and respond on its behalf Your letter contained a great deal of information and allegations, which we immediately began to examine. Our investigation involved a thorough review of your letter, interviews with individuals involved in the matters raised by your letter, including but not limited to representatives of Federal Management, Co., Inc., the managing agent for Stearns. We also reviewed certain documentation we felt was relevant to the matter.

On April 7, 2003, 1 contacted you in writing asking for an opportunity to speak to you by telephone and noted you did not include your telephone number in the correspondence of February 10. Your response to my letter did not provide your telephone number I had requested. I wrote to you again on April 30, 2003 and indicated that since you were unwilling to leave your telephone number, we would conclude the matter without the benefit of talking to you. On May 7, 2003, you indicated that you tried to call me. I did not receive a telephone number to call you back. You accused me of misstating facts and implied that RHF would somehow misuse "verbal communication."

We have reviewed the actions of Federal Management Co. Inc. ("Federal"). We believe Federal acted reasonably, appropriately and in good faith concerning your mother's safety. We regret that you are dissatisfied with Federal's actions, and disagree with your assertions concerning false statements by representatives of Federal and wrongful intent of Federal and RHF in connection with this matter.

Please feel free to contact me if you should wish to discuss this matter further.

Very truly yours,
Stuart Hartman
Vice President of Operations

Cc:   Laverne R. Joseph
      Robert Amberg
      RHF Board of Directors

Mary Lou Moore    SSN: 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    DOB:    01/01/1916                    Seen:   4/22/02 1:1

Exhibit
J1

# 800 Triage Report for Mary Lou Moore    EUm

## Patient Information

Name: Mary Lou Moore                       Sex: Female                 Age: 86
SSN: 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                           DOB: 01/01/1916
Address:      10 Temple Place #10          DOB: 1/10/1916
City, State, Zip: Boston, MA 02111
Phone: (617) 442-2202 _____
Homeless: No                               Shelter Name: N/A
Primary Language: English                  Race: Black, African American
Need Interpreter: No

### Current Status

Patient is currently located at Federal Management Ind Living. The street address is 10 Temple
Place  in Boston, MA. Patient living situation is <Not reported>.

### Caller Information

Caller Name:  Mary Gavin               Caller Phone:  (617) 451-0169 _____
Relationship: Case Manager

### Difficulty

Text entered by balmy at 04/22/2002 01:21 PM:    (Triaged by balmy)    Ct is 86 yo female,
demented, disorganized, unable to care for self, ct thinks she is in Alabama, unable to care for
herself, continues to walk out in traffic all day long. Caller has no information about the ct other
than she has been decompensating for approximately 2 yrs. Ct is currently in Ind Living program.
Sect 12 issued by BEST to send ct to BMC.

### Insurance Information

                    Provider                          ID Number
Primary Ins:        Medicare with Medicaid            421223022
Secondary Ins:

### Medical History

Current Conditions:    None Reported

Past Conditions:       <Not reported>

*Mary Lou Moore   SSN:   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   DOB:*   01/01/1916          Seen:   4/22/02 1:11:52 PM

**Current Allergies:**       <Not reported>

**Past Allergies:**       None Reported

|  | Dosage | Frequency |
|---|---|---|
| **Current Medications:** | | |
| Zantac | 150mg | QD |
| Lasix | 20mg | QD |

|  | Dosage | Frequency |
|---|---|---|
| **Past Medications:** | | |
| **None Reported** | | |

|  | Date | Location |
|---|---|---|
| **Current Treatments:** | - | . |
| <Not reported> | | |

|  | Date | Location |
|---|---|---|
| **Past Treatments:** | | |
| **None Reported** | | . |

## Substance Abuse

|  | Last Used | Frequency | Route |
|---|---|---|---|
| **Current Substances:** | | | |
| <Not reported> | | | |

|  | Last Used | Frequency | Route |
|---|---|---|---|
| **Past Substances:** | | | |
| **None Reported** | | | |

Indications from VASA substance abuse section:
**No abuse of any drugs.**

## Potential for Violence

*Mary Lou Moore  SSN: 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  DOB: 01/01/1916*          *Seen: 4/22/02 1:11:02 PM*

Patient is not considered to be dangerous.

Indications from VASA current violent thoughts section:

Indications from VASA recent violent behaviors section:
Showed good control of his (her) behavior.

Indications from VASA past history of violent behaviors section:
Has no past history of violence.

## Potential for Suicide

Patient is not considered to be suicidal at this time.

Indications from VASA current suicidal thoughts section:
Reveals no suicidal ideas.

Indications from VASA suicide recent suicidal behaviors section:
Has no suicidal plans or attempts.

Indications from VASA past history of suicide section:
Has no past history of suicidal ideas or attempts.

## Miscellaneous Patient Information

Living Situation:  <Not reported>          Education:          <Not reported>
Marital Status:    Widowed                 Employment Status:  <Not reported>
Center Assigned:   SCFMHC                  Occupation:         <Not reported>

## Current Legal Status

Legal Status:      <Not reported>

Details: None provided.

Exhibit K-1

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF MENTAL HEALTH
### APPLICATION FOR AND AUTHORIZATION OF TEMPORARY INVOLUNTARY HOSPITALIZATION
#### M.G.L. Chapter 123, Sections 12 (a) and 12 (b)

## Application Pursuant to 12 (a)

1). Application to (Facility Name): _Bml. E.R._

2). I hereby apply for admission of (name of patient): _Mary Lou Moore_
Address: _10 Temple Place_ City/Town _Boston_ State _Mass_
Social Security Number: _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_ Date of Birth: _1/1/46_ Sex: M ☐ F ☒

to the facility named above pursuant to M.G.L. c. 123, s. 12 (a). This person, in my opinion, requires hospitalization at the above named facility so as to avoid the likelihood of serious harm by reason of mental illness. Evidence supporting my opinion follows:

A). **Mental Illness:** For purposes of admission to an inpatient facility under Section 12, "Mental illness" means a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality or ability to meet the ordinary demands of life. Symptoms caused solely by alcohol or drug intake, organic brain damage or mental retardation do not constitute a serious mental illness. Specify evidence including behavior and symptoms:

_Psychotic, Disorganized, Disoriented_

B). **Likelihood of Serious Harm** (check all categories that apply):

_✓_ (1) Substantial risk of physical harm to the person himself/herself as manifested by evidence of threats of, or attempts at suicide or serious bodily harm; and/or

___ (2) Substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; and/or

___ (3) Very substantial risk of physical impairment or injury to the person himself/herself as manifested by evidence that such person's judgment is so affected that he/she is unable to protect himself/herself in the community and the reasonable provision of his/her protection is not available in the community.

Specify evidence including behavior and symptoms: _Ct thinks she is in Ballroom — continues to_
_walk into traffic — disoriented unable to care for self_

3). **Applicant Certification** (check all applicable boxes):

a. I am a: ☐ Licensed Physician   ☐ Qualified (i.e. Licensed) Psychologist
☑ Qualified (i.e. Licensed and Certified) Psychiatric Nurse Mental Health Clinical Specialist
☐ Police Officer

b. I have ☐ I have not ☑ personally examined this person. If not, why? _____

c. ☑ I have consulted with either the receiving facility or emergency screening program.
☐ I have not so consulted
because _____

Applicant's name (not patient):
(print) _Linda Young Schollnick LICSW/P_ Phone _1-800-981-4357_
Address: _NFMC_ City/Town _Boston_ State _NH_

Applicant's signature _Linda Young Schollnick LICSW/P_ Date: _4/22/02_ Time: _1:00 pm_

NOTE: Parts 1) through 3), above, must be completed to apply for involuntary hospitalization.

Form AA-2          See Reverse for Section 12(b)          Effective — November 11, 2000



# MURDER SUSPECT HAD PSYCHIATRIC ILLS SOUGHT TREATMENT PRIOR TO KILLINGS

**Author:** By Michael S. Rosenwald, and Ellen Barry, Globe Staff **Date:** 09/27/2002 **Page:** A1 **Section:** Metro/Region

On Sunday, Jason Potter, a troubled young man with a history of mental illness, told his mother he "couldn't abide by himself" and needed help. So, as Marie Sheehan had done before, she helped her son check into the psychiatric ward of Caritas Carney Hospital near their Dorchester home.

After two days under heavy sedation, Potter, 21, signed himself out; by Wednesday, however, his bizarre behavior had returned. But a state-contracted emergency psychiatric team apparently decided that Potter didn't need immediate hospitalization and asked him to come back yesterday afternoon.

Within hours, police said, Potter had slain his mother and hacked her husband, Richard Sheehan, a retired Boston police officer, to death inside the family home on Jo-Anne Terrace.

Potter, who authorities say has suffered from mental illness since he was a teenager, called 911 and said he found his mother and "some other person" stabbed to death in the house, prosecutors said yesterday. Potter was found at the crime scene, spattered with blood.

After taking him for psychiatric evaluation at Caritas Carney, police arrested Potter, who detectives said made incriminating statements, including, "You got me," and "You solved the case."

Potter was arraigned on two counts of murder in Dorchester District Court and ordered held without bail. He also was sent to Bridgewater State Hospital for a 20-day psychiatric evaluation.

Tiny Jo-Anne Terrace was cordoned off as a crime scene late yesterday, with lights on inside the Sheehans' tan Cape Cod-style home. George Kenneally, 75, whose house faces the Sheehans' home, said his neighbors had been friendly.

If their son had mental problems, Kenneally said, it wasn't obvious.

"It's an awful thing to think," Kenneally said. "I feel like I want to be under a blanket."

The killings and arraignment sent a shiver through the Dorchester courthouse, where Sheehan worked supervising cases in the final years of his 35-year police career. He retired five years ago, having earned a medal of honor for resuscitating a woman who had passed out in a convenience store in 1979.

Police said Sheehan, 71, and his 46-year-old wife were dead when EMS crews arrived shortly before midnight. Investigators also said Potter, who is tattoed and has a criminal record, did not get along with Richard Sheehan.

Potter has been arrested five times since July 9, once for threatening to stab his ex-girlfriend. He was released from Nashua Street Jail on Sept. 18 after serving about 30 days for violating a restraining order and driving under the influence, court records show.

At the arraignment, Bernard Grossberg, Potter's court-appointed lawyer, said Potter has been suffering from mental illness since age 14, including schizophrenia and manic depression, and is now considered a suicide risk.

Shortly after he was released from jail, Grossberg said, Potter's behavior began to deteriorate, and he began complaining "he couldn't abide by himself." His mother took him to Caritas Carney on Sunday and asked doctors to commit him involuntarily, meaning he couldn't leave without a doctor's approval.

Instead, Potter agreed to be committed, spending the next two days sedated and sleeping, Grossberg said. When he awoke on Tuesday, Potter left the hospital, and by Wednesday he began acting strangely again, Grossberg said. During a home visit, Potter's probation officer urged him to get psychiatric help.

Grossberg said Marie Sheehan took her son to his long-term therapist, who referred him to the **Boston Emergency Services Team (BEST) - a service of Tufts-New England Medical Center,** Massachusetts General Hospital, and several community health centers - which is under contract with the state to provide emergency psychiatric care for poor, mentally ill patients.

Rather than admit him to a hospital immediately, the **BEST team** sent Potter home on Wednesday afternoon with a return appointment for 1 p.m yesterday, Grossberg said. Potter also had an appointment with a psychiatrist today.

By yesterday morning, Potter was under arrest on charges of killing the Sheehans.

**BEST teams** work out of several community mental health centers and respond to acute psychiatric crises, such as suicide attempts or violent behavior, by recommending hospitalizations, counseling, or other interventions.

Dr. Marshal Folstein, chief of psychiatry at Tufts-**New England Medical Center**, who directs the **BEST team**, did not return a call from the Globe. Officials from the state's Department of Mental Health also did not return calls yesterday seeking comment.

Bruce Bird, chief executive of North Suffolk Mental Health Association, said psychiatric decisions about a patient's dangerousness are "very hard, of course, because the technology and science behind making this decision isn't where it needs to be."

The **BEST team** "could have made a most appropriate decision for that moment," he said. "But things changed three hours later."

In a statement released yesterday, Caritas Carney Hospital said it could not release information about its "extremely brief" care of Potter, citing confidentiality rules.



"However, we would never release a patient if we believed that patient to be a threat to himself or others," said the statement, signed by hospital president Joyce A. Murphy. "That's a responsibility we take very seriously - a responsibility both to our patients and our community."

Some time Wednesday evening, Marie Sheehan phoned Barnet Potter, her ex-husband, urging him to come help calm down their son, according to a family friend who asked not to be named.

The friend said Barnet Potter, who had kept a good relationship with his ex-wife after their divorce a decade ago, rushed to Jo-Anne Terrace. He stayed for a while, then left when his son calmed down.

"He seemed fine, so [Barnet] left," the friend said.

The friend said Barnet Potter told him he was trying to get help for his son, but the young man waffled between agreeing with treatment suggestions and arguing he did not need medical assistance.

Court records show that Potter twice violated a restraining order obtained by his ex-girlfriend, repeatedly calling her and threatening to stab her if she didn't lie to authorities about his arrest on charges of drunken driving and leaving the scene of an accident.

Potter was also arrested in July on charges of trespassing at Boston Bowl on Morrissey Boulevard, where he allegedly ran onto an alley and caused a disturbance.

On Wednesday night, Boston Police Captain Robert Dunford - commander of the district in which Richard Sheehan last worked, and one of the officers at the scene - said investigating violent deaths are always difficult, but the task gets harder when an officer knows the victim.

Since Sheehan retired five years ago, Dunford said, their paths crossed occasionally in Dorchester where they both lived. "He was always a nice guy," Dunford said. "He was a very quiet guy, sort of kept to himself. But very dependable."

Sheehan joined the force in 1959 and retired in 1996, spending time on the auto task force and at assignments to various city neighborhoods before supervising cases at Dorchester District Court.

In 1979, Sheehan received a medal of honor for rendering first aid to a woman in a Mattapan convenience store, said police spokeswoman Mariellen Burns. He received several other letters of commendation.

Sheehan and his first wife, Jeanne, divorced in the early 1990s, court records said. Married in 1956, the couple had five children.



# POTTER FAMILY LOOKED FOR HELP EFFORTS FRUSTRATED BY ACCUSED, SYSTEM

**Author:** By Ellen Barry and Alice Dembner, Globe staff **Date:** 09/28/2002 **Page:** B1 **Section:** Metro/Region

John Ellement of the Globe staff contributed to this story.

For a week and a half before Jason Potter, 21, allegedly stabbed his mother and stepfather to death in the family's Dorchester home near midnight Wednesday, family members had struggled to provide him psychiatric treatment but had been frustrated at every turn, said his biological father and a family friend yesterday.

As the police investigation continued, two distinct pictures of Potter were emerging: On one hand was a patient who did not appear dangerous to a long-term therapist, an emergency assessment team, and staff at Caritas Carney Hospital during the 48 hours before the murder.

On the other hand is the account of Barnet Potter, Jason's father, and Cheryl Blackberg, a close friend of the family, who say they were pressing for him to be involuntarily committed, and watched him get increasingly psychotic as a series of mental health professionals deemed him not dangerous. On Tuesday, Blackberg said, for the first time she was afraid.

"As I was leaving, there was a look that came over him when he was looking at his mother," said Blackberg, 38, whose friendship with Marie Sheehan dates back 20 years. "I came home and told my husband, `For the first time in my life, I'm afraid of that child.' It was a look I had never seen in my life. The look was awful."

In the coming weeks, the Department of Mental Health will investigate critical moments in Potter's care, said Commissioner Marylou Sudders. The Boston Emergency Services Team will also perform its own internal investigations, said Richard Sheola, president of the public sector division of Value Options, the for-profit company that oversees and hires the *BEST* **team**, which made assessments of Potter on the Sunday and Wednesday before the murders.

"It's a horrifying outcome and very upsetting for anybody involved," Sheola said. "Our heart goes out to the family, but it would be premature to make any judgment about what went wrong, if anything. We encourage our staff and our emergency service programs . . . to err on the side of safety."

But Bernard Grossberg, Potter's court-appointed attorney, said he doesn't understand why Potter was not kept in the hospital.

"It might be difficult to predict how dangerous a person is, but it's a little different when there's a lapse of only a day from the time of release to the time of the violence," Grossberg said. "It certainly raises a large number of very serious questions at this time. Why was he allowed to leave Carney? . . . What happened when the **BEST team** saw him? Did they simply rush him through? Was it someone being too lazy to start a commitment Wednesday afternoon?"

Richard and Marie Sheehan were only too familiar with the process of hospitalizing Jason, Blackberg said. Potter was diagnosed with schizoaffective disorder and bipolar disorder in his mid-teens, and took the antipsychotic drug Zyprexa until he reached the age of 18, she said. Symptoms of schizoaffective disorder typically include delusions and hallucinations, combined with depression or mania.

But on his 18th birthday, Potter used his new rights as an adult to discontinue the medication, and for the last three years he had gone without it, said Blackberg and Potter.

Over the years that followed, he was hospitalized at Somerville, Bournewood, Charles River, and Westwood hospitals, among other facilities, said Grossman. This summer, his behavior became increasingly bizarre. He was arrested for the first time in his life, said his lawyer.

In July, after he was arrested for operating under the influence and smashing into three parked vehicles, Potter began urinating on the floor of the booking area in the police station. Several days later, he was spotted running through Boston Bowl in Dorchester - whose managers had secured a restraining order against him for public drunkenness - and after police were called, Potter "became physically abusive to himself, banging his head against his knees and a bench, causing injury to his eye," according to a police report.

Meanwhile, Potter kept trailing his former girlfriend, a 19-year-old from Dorchester who had also secured a restraining order against him. In mid-August, he turned himself in to Dorchester police, where he confessed that he walked into the young woman's workplace "in order to obtain a bus schedule."

Then, on Sept. 11, the young woman called police to say Potter had pressed her to lie in his defense - calling her more than 15 times - and threatened to stab her if she did not. A relative of his girlfriend, who asked that she not be identified, said she had distanced herself from him as his behavior became strange.

"She left him in July because she was fearful for her safety, and part of the reason for that was his drug abuse, his abusive behavior to her," said the relative, who would not give his name. "She feels horrible about Mr. and Mrs. Sheehan, and at the same time, she's grateful that it didn't happen to her."

On Sunday, shortly after he finished a 30-day jail sentence for violating the restraining order against the woman and for driving under the influence of alcohol, Potter showed up at Blackberg's house - which he had been visiting frequently - and told her he had gotten lost on the way there. When she gave him a sandwich, Potter "sat there staring at the sandwich as if he wasn't sure what to do with it," she said.

"He said, 'Auntie, my head's all scrambled,' " Blackberg said. "I said, 'Do you want me to take you to the hospital?' He said, 'Yes, I do, but I don't want to go by myself.' "

At Caritas Carney, Potter was assessed by a member of the Boston Emergency Services Team, and although Richard and Marie Sheehan both offered to "pink-slip" him, which would initiate

involuntary commitment proceedings, the **BEST team** member said it would be better to admit Potter voluntarily, said Blackberg and Potter.

So Potter was admitted under a "conditional voluntary" basis, but almost immediately submitted a request for release, forcing hospital staff to choose whether to release him or petition a judge for legal commitment procedures. A clinical assessment must occur in order to move forward with the release, and in this case, it was made by a physician, Sudders said.

A spokesman for Caritas Carney would not comment yesterday on the decision to release Potter. **Tufts-New England Medical Center**, which holds the contract for the **BEST team**, also would not comment on any interaction with Potter.

When Potter signed himself out of the hospital, he returned to the house on Jo-Anne Terrace in an agitated and combative state, Blackberg said, and stayed up most of Tuesday night. On Wednesday morning, he met with his therapist at the South End Community Mental Health Center, who referred him to the **BEST team**, said his father. The **BEST team** judged that he was not an immediate threat, and he was scheduled to meet with a therapist on Thursday, Potter and Blackberg said.

"If they had kept him, those two people would still be alive," said Barnet Potter.

In a city that has seen three violent crimes involving psychiatric patients over the summer, mental health professionals said decisions about patients' potential for violence are some of clinicians' most challenging moments. Sheola, while acknowledging the tragedy that occurred, noted that the Boston team had 10,000 interactions with patients last year, while 22 other teams statewide recorded an additional 50,000 interactions with patients outside of Boston without other resulting violent crimes.

Dr. Jefferson Prince, chief of child psychiatry at North Shore Medical Center and a child psychiatrist on staff at Massachusetts General Hospital, says doctors worry constantly that they may make a wrong decision about hospitalization.

"The legal push is to give care in the least restrictive setting. It's a difficult and narrow bridge to walk between what are people's rights and how to implement needed services. These illnesses can look one way at 1 o'clock and look very different at 6 o'clock. We're pretty lousy at predicting who's going to get violent."

Among the people most haunted by that decision is Blackberg, who recalls calling Marie Sheehan on Wednesday night and telling her to be careful around her son.

"I said to her, `Be careful, I'm worried about you.' She said, `Even at the height of his psychosis Jason would never hurt me,' " Blackberg said. "She loved him unconditionally."

Ellen Barry can be reached at barry@globe.com





Exhibit N1

## Tufts-New England Medical Center

The principal teaching hospital for
Tufts University School of Medicine

Benjamin Andrews
Chair in Surgery Emeritus

Executive Office
Tel: 617-636-9569
Fax: 617-636-7623

April 8, 2003

Thomas F. O'Donnell, Jr, MD
*President and
Chief Executive Officer*

Christopher A. Moore
141 Intervale Street
Boston, MA 02121

Dear Mr. Moore:

The purpose of this letter is to respond to your letter and report of February 6, 2003, which describe your dissatisfaction with the treatment received by your mother, Mary Lou Moore, from the Boston Emergency Services Team (BEST) on April 22, 2002. Thank you for providing us with Mrs. Moore's written consent to discuss her medical and psychiatric information with you.

In your letter and report, your complaint about Tufts-New England Medical Center (T-NEMC) was that your mother was evaluated at Boston Medical Center (BMC) for mental illness pursuant to an allegedly inappropriate Section 12 Application filed by T-NEMC employee, Linda Young Sahovey, Clinical Director of the BEST Program.

We have spoken with Linda Young Sahovey and Bill Almy in response to your complaint. On the date at issue, a call was received by the BEST hotline by Bill Almy from Mary Gavin of Federal Management Independent Living, who stated that she was Mrs. Moore's case manager. Ms. Gavin reported that the client was an 86 year-old, who was demented, disorganized and unable to care for herself. Also, it was noted that Mrs. Moore thought she was in Alabama and was leaving her apartment and walking in traffic all day long. In addition, Ms. Gavin said that the client had been decompensating for two years. Concerns about the client's judgement were noted, and Ms. Gavin said that she was unable to contact her family.

In response to the call, staff issued a Section 12 under Massachusetts law, which authorizes the transport of a person who is at risk to themselves or others to a hospital for an involuntary temporary hospitalization. This is a practice which is done as the standard of care to protect a client from harm, when a community agency notifies the BEST hotline about a person who is at risk because of suspected psychiatric illness. In such a situation, since the hotline staff cannot evaluate the client in person, they must rely upon the caller's information and provide an evaluation for the client. We had no further contact with the evaluating facility or others about your mother at that time.

**Tufts-New England Medical Cente**
Established 1796

750 Washington Street
Tufts-NEMC #451
Boston, Massachusetts 02111

You also inquired about our relationship with various agencies which have been involved with your mother. BEST, set-up by the state to provide emergency psychiatric services to clients, maintains a telephone hotline for that purpose. T-NEMC's role in BEST is to furnish administrative services, and the hotline is located at and managed by T-NEMC employees. Massachusetts Behavioral Health Partnership is the vendor, which manages this Program for the state.

Our relationship with Ethos Elder Services, Boston Senior Home Care, Federal Management Company and other community providers and agencies like them is limited to client referrals and interactions that may relate to the care and treatment of clients. We had no ongoing interactions with any agencies or providers relating to further care or treatment of Mrs. Moore since your mother's Section 12 Application of April 22, 2002 and her T-NEMC emergency department visit of August 16, 2002.

We did refer Mrs. Moore to the Boston Visiting Nurse Association and interact with them when your mother was receiving inpatient and outpatient care at T-NEMC prior to 2001.

Regarding your mother's emergency department visit of August 16, 2002, Mrs. Moore was brought to the T-NEMC emergency department by Boston EMS accompanied by two Ethos caseworkers. According to the record, the Ethos social workers had a court order to admit Mrs. Moore to a nursing home, and she was transferred to the Star of David Nursing Home. Our role in that visit was the provision of a medical sreening examination for your mother.

We are sorry for any distress that your mother, you and your family experienced as a result of the Section 12 Application and her transport to BMC for evaluation. However, when the BEST hotline staff receives a call, they must make an immediate decision to provide an assessment of the client or to leave the client in a seemingly unsafe situation. In Mrs. Moore's case, they were told that she was an elderly lady living alone, who had been wandering outside of her apartment, and that she had been mentally declining over the last two years. The Section 12 was filed to protect Mrs. Moore from injury and to determine if medical, psychiatric or protective services were necessary.

Thank you for taking the time to inform us of your concerns. Please be assured that we are continuously striving to provide quality care to our patients. We hope that Mrs. Moore is currently doing well. You may contact Ricki Strader at (617) 636 -8055 if you have further questions.

Sincerely,

Thomas F. O'Donnell, Jr., M.D.
President & CEO

Cc: (all board members)
    Linda Young Sahovey